Rebecca Ann SHAW, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–03–00299–CR.

Court of Appeals of Texas, Waco.

Nov. 9, 2005.

Opinion Overruling Rehearing Dec. 14, 2005.

Rehearing Overruled Jan. 3, 2006.

L. Patrick Davis, Ft. Worth, for appellant.

Dale S. Hanna, Johnson County Crim. Dist. Atty., Cleburne, for appellee.

Before Justice VANCE, Justice REYNA, and Senior Justice HILL (Sitting by Assignment).

## OPINION

JOHN G. HILL, Senior Justice (Assigned).

Rebecca Ann Shaw appeals her conviction by a jury of the offense of recklessly causing serious bodily injury to a child. The jury assessed her punishment at twenty years in the Texas Department of Criminal Justice, Institutional Division, and a fine of $10,000. She asserts in a single point that the trial court erred in refusing to submit her timely requested defense to prosecution of injury to a child, that the act or omission consisted of emergency medical care administered in good faith and with reasonable care by a person not licensed in the healing arts. We affirm.

■ As a general rule, an accused has the right to an instruction on any defensive issue raised by the evidence, whether such evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence. *Miller v. State,* 815 S.W.2d 582, 585 (Tex.Crim.App.1991). An element of the defense is "raised" if, viewing the evidence in the light most favorable to the defendant, there is evidence that a rational juror could accept as sufficient to prove that element. *See Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54, 61 (1988); *United States v. Maseratti,* 1 F.3d 330, 336 (5th Cir.1993); *Ferrel v. State,* 55 S.W.3d 586, 591 (Tex.Crim.App.2001); *Johnson v. State,* 157 S.W.3d 48, 50 (Tex. App.-Waco 2004, no pet.); *Wilson v. State,* 777 S.W.2d 823, 825 (Tex.App.-Austin 1989), *aff'd,* 853 S.W.2d 547 (Tex.Crim. App.1993). Whether the defense is raised by the evidence is always a question of law. *Id.*

■ The dissent questions our reliance on a rational-juror test as a basis for determining whether defensive evidence is sufficient to require an instruction, arguing that the use of such a test wrongly allows the court to weigh the relative credibility of the evidence. We submit that the test assumes the credibility of the evidence supporting the defense, then determines whether it is evidence that a rational juror could accept as sufficient to prove the elements of the defense.

■ The dissent also suggests that a rational-juror test is in conflict with the concept that an accused has the right to an instruction on any defense issue raised by the evidence, regardless of its strength or credibility. Rather, the rational-juror test is the standard by which we determine whether that evidence has raised a defensive issue. Our opinion is not in conflict with opinions of the Texas Court of Criminal Appeals or of this court that hold that a defendant is entitled to an instruction when a defensive issue has been raised by the evidence, regardless of its strength or credibility, but do not explicitly set forth the standard by which the court determines when the defensive issue has been raised. The real alternative standard to that which we have set forth is that a defendant is entitled to an instruction on a defensive issue even if the evidence would not rationally support a finding of the elements of the defense. We respectfully decline to adopt that standard.

■ It is a defense to prosecution for injury to a child that the act or omission consisted of emergency medical care administered in good faith and with reasonable care by a person not licensed in the healing arts. TEX. PEN.CODE ANN. § 22.04(k)(1)(B) (Vernon 2003). Shaw was convicted of recklessly causing serious bodily injury to a child by shaking the child and causing his head to strike an unknown object. We will first see if there is evidence from which a rational juror

could conclude that Shaw's shaking the child and causing his head to strike an unknown object consisted of emergency medical care administered in good faith and with reasonable care.

Shaw testified that on the day in question she had been caring for her grandchild in her home for almost a month. She said that she called 911 because the child was in his crib having labored breathing. She stated that when she saw the child having breathing problems, she dropped the clothing she had in her hand and ran to his crib, picked him up, and called to him, but he did not respond. She acknowledged that she had performed CPR before this occasion.

She testified that she went over and "went like this" and picked up the child "like this," called the child's name, and "his little head went over." She stated that she ran through the house to get the baby's heart monitor, while holding the baby "like this." She indicated that rather than hooking the child up to the heart monitor, she got a wet rag and patted the child with it "like this." In getting the rag wet, she could not get the faucet on so she switched arms "like this."

Shaw testified that she took the child to the bedroom, placed him on the bed with the heart monitor, and grabbed the phone. She related that after trying to call her landlord, she called 911. She stated that she was instructed by the 911 dispatcher. She indicated that she was told to do rescue breathing and tip the child's head back. She said she tipped the child's head back and blew in his mouth.

Shaw testified that she felt that she was not getting a seal on the child's nose with her cheek, and she could not open her mouth big enough to get around his mouth and his nose. She stated that when the paramedics were on their way and she realized the door was locked, she grabbed the child underneath "like this," while running through the house to unlock it. According to Shaw, after unlocking the door, she returned to the phone where she started to do CPR when the paramedics told her to do it. Shaw testified that at first two police officers showed up and performed CPR. She indicated that the paramedics started working on the child after they arrived. The 911 tape reflected the panic and stress of Shaw's voice as she responded to the crisis.

Dr. Angel Hernandez, a pediatric neurologist, testified that on the evening the child was brought to the hospital, he was called in to help evaluate the child. After conducting several tests, Dr. Hernandez concluded that bleeding in the child's brain was caused by shaking the baby or by hitting it with something in the head. He insisted that such an injury could have occurred within minutes or no more than four to six hours previously. In a consultation report dated the day of the child's being taken to the hospital, Dr. Hernandez concluded that certain bleeding in the brain was probably the result of aggressive, cardio-pulmonary resuscitation, but that he could not rule out the possibility of non-accidental trauma.

In summary, Shaw testified how she ran through the house with the baby and how she performed CPR on the baby, while one of the attending physicians, at least initially, thought that the injury was the result of aggressive cardio-pulmonary resuscitation. That same physician testified that in his opinion shaking the baby or hitting it in the head caused the injury. The emergency medical care for the baby was CPR. There was no testimony regarding how either the responding police officers or the responding paramedics conducted CPR. There is no evidence that shaking a baby or causing its head to hit an object, even including a bed, is reasonable in conduct-

ing CPR on an infant. Therefore, assuming there is evidence that Shaw shook the baby and hit its head against an object, which might include the bed, there is no evidence from which a rational juror could conclude that such action was a reasonable way to conduct infant CPR. Inasmuch as the average jury would be unfamiliar with the appropriate conduct of infant CPR, it would not be in a position to judge whether Shaw's actions were reasonable under the circumstances. If one were to suggest that the jury could make such a determination through common knowledge, common knowledge would be that shaking a baby and hitting its head against an object, even a bed, would not be a reasonable way to conduct CPR. We hold that a rational juror could not conclude from this evidence that shaking the baby or causing its head to hit an unknown object consisted of emergency medical care administered in good faith and with reasonable care.

■ We next consider whether there is evidence from which a reasonable juror might conclude that Shaw was a person not licensed in the healing arts. "Healing arts" is not defined in section 22.04 of the Texas Penal Code. *See* TEX. PEN.CODE ANN. § 22.04 (Vernon 2003). We must therefore construe the meaning of the term as it is contained in section 22.04(k)(1)(B) of the Code. The provisions of the Penal Code are to be construed according to the fair import of their terms, to promote justice and effect the objectives of the code. TEX. PEN.CODE ANN. § 1.05(a) (Vernon 2003). Unless a different construction is required by the context, sections 311.011, 311.012, 311.014, 311.015 and 311.021 through 311.032 of the Government Code (Code Construction Act), apply to the construction of the Penal Code. TEX. PEN.CODE ANN. § 1.05(b) (Vernon 2003). We are to read words and phrases in context and construe them according to the rules of grammar and common usage. TEX. GOV' T CODE ANN. § 311.011(a) (Vernon 2005). We are to construe words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, according to that meaning. TEX. GOV' T CODE ANN. § 311.011(b) (Vernon 2005).

Whether or not this statute is considered ambiguous on its face, we may consider, among other matters, the: (1) object sought to be attained; (2) circumstances under which the statute was enacted; (3) legislative history; (4) common law or former statutory provisions, including laws on the same or similar subjects; (5) consequences of a particular construction; (6) administrative construction of the statute; and (7) title (caption), preamble, and emergency provision. TEX. GOV' T CODE ANN. § 311.023 (Vernon 2005).

Shaw testified that at the time she became totally responsible for the care of the child, she was working as a pediatrician's medical assistant, taking care of all the pediatric care. She outlined her duties and responsibilities under that pediatrician, as "everything required to take care of all the children in her office, immunizations, checking them in, weighing them." When asked what the licensing was for becoming a medical assistant to a pediatrician, she said that one has to go through school and become licensed. She indicated that she went through the school and graduated.

A person may not practice as a physician assistant unless the person is licensed. TEX. OCC.CODE ANN. § 204.151 (Vernon 2004). We are not aware of any medical assistants, other than physician assistants and nurses, who are required to be licensed. Since Shaw does not appear to be a nurse, the only reasonable conclusion that may be drawn from her testimony is that she is licensed as a physician assistant. The question we must determine is

whether a physician assistant is a person licensed in the healing arts within the meaning of section 22.04 of the Texas Penal Code.

"Healing" has been defined as "tending to heal or cure." *Webster's Third New International Dictionary of the English Language Unabridged* 1043 (Merriam–Webster, Inc.1993). "Art" has been defined as "the power of performing certain actions esp. as acquired by experience, study, or observation." *Id.* at 22. Internet research through the Google search engine reveals that the term "healing arts" in common usage includes a broad range from physicians to massage therapists and crystal healers. The legislature, in the Healing Art Identification Act, broadly defined the "healing art" as "any system, treatment, operation, diagnosis, prescription, or practice to ascertain, cure, relieve, adjust, or correct a human disease, injury, or unhealthy or abnormal physical or mental condition." TEX. OCC.CODE ANN. § 104.002 (Vernon 2004).

Having broadly defined "healing art," the legislature in the next section of the Healing Art Identification Act includes a list of legally required identifications that must be used by certain practitioners of the healing arts. *See id.* § 104.003 (Vernon 2004). Those include physicians, dentists, chiropractors, optometrists, and podiatrists. There is no stated identification in this section for physician assistants. *Id.* All of these medical professionals are licensed; however, in another statute the legislature has subsequently provided that even certified medical workers are involved in the healing arts. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.152 (Vernon 2005).

■ Therefore, given the broad definition of the healing arts, and its broad usage in our society; given the fact that physicians are practitioners of the healing art and physician assistants perform many of the same practices as a physician, acting under the supervision of a physician; and given that the legislature has subsequently provided that even certified medical workers are involved in the healing arts, we hold that a physician assistant is, for the purpose of the defense to this prosecution, a person licensed in the healing arts. Consequently, Shaw, who is a licensed physician assistant, is licensed in the healing arts with respect to the purpose of the defense to this prosecution. We recognize the possibility that, despite her testimony, Shaw may be an unlicensed medical assistant who performs only routine tasks in the office to assist the physician. However, in view of Shaw's testimony that she was licensed, and her broad testimony as to her duties, a rational juror would be required to resort to speculation in order to make such a determination.

With respect to this aspect of the issue, Shaw relies on the cases of *Moore v. Trevino,* 94 S.W.3d 723 (Tex.App.-San Antonio 2002, pet. denied), and *Hernandez v. Lukefahr,* 879 S.W.2d 137 (Tex.App.-Houston [14th Dist.] 1994, no writ). We find both cases to be distinguishable.

In *Moore,* the court held, in construing the former section 74.002 of the Good Samaritan Act,[1] that emergency medical service personnel are not persons licensed in the healing arts within the meaning of that statute. *Moore,* 94 S.W.3d at 727. Section 74.002 provided that persons not licensed in the healing arts who in good faith administer emergency care as emergency medical service personnel were not

---

1. Civil Practice & Remedies Code, 69th Leg., R.S., ch. 959, § 1, sec. 74.002, 1985 Tex. Gen. Laws 3242, 3299 (amended 2003) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 74.152 (Vernon 2005)).

liable in civil damages for an act performed in administering the care unless the act was willfully or wantonly negligent, without regard to whether the care was provided for or in expectation of remuneration.[2] Civil Practice & Remedies Code, 69th Leg., R.S., ch. 959, § 1, sec. 74.002, 1985 Tex. Gen. Laws 3242, 3299 (amended 2003) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 74.152).

We first note that the statute by its terms leads one to the conclusion that the legislature did not intend that emergency medical service personnel be considered as persons licensed in the healing arts. *Id.* The court reached its conclusion on the basis that emergency medical service personnel are not engaged in the practice of medicine and are not health care providers. *See Moore,* 94 S.W.3d at 727. The second reason for the court's decision is that emergency medical personnel are not listed in the listing of healing arts in the Healing Art Identification Act and were not engaged in the practice of medicine or an equivalent practice in other statutes. *Id.*

In the case at bar, Shaw, as a licensed physician assistant, is engaged in the practice of medicine under the supervision of a physician and, unlike an emergency medical technician, is a healthcare provider.

*See* TEX. OCC.CODE ANN. §§ 152.003(a)(1)(J), 204.204 (Vernon 2004). Although not listed in the Healing Art Identification Act, physician assistants are daily engaged in the practice of medicine or "an equivalent practice in other statutes." As we have previously noted, "healing arts" has been applied by the legislature to even certified medical workers who would necessarily not be among those listed in the Act. Therefore, we find that *Moore* is distinguishable and is not in conflict with this decision.

In *Hernandez,* the court held that a physician, who did not fall into one of the exceptions listed in the former section 74.001 of the Good Samaritan Act,[3] was excluded from liability under that statute for emergency care that he administered unless his actions were willfully or wantonly negligent. *See Hernandez,* 879 S.W.2d at 140–42. Since that statute applied to any person who in good faith administered emergency care at the scene of an emergency or in a hospital and who did not fall within one of the four exceptions found in the statute, this holding is of no assistance in our determination of whether a physician assistant is licensed in the healing arts. *See id.* As previously noted, we find *Hernandez* to be distinguishable from the case at bar because it does not involve a

---

**2.** The current version of the statute was broadened slightly to include not only "persons not licensed" but also "persons not ... *certified* in the healing arts." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.152 (emphasis added).

**3.** The former section 74.001 provided:

(a) A person who in good faith administers emergency care at the scene of an emergency or in a hospital is not liable in civil damages for an act performed during the emergency unless the act is wilfully or wantonly negligent.

(b) This section does not apply to care administered:

(1) for or in expectation of remuneration;

(2) by a person who was at the scene of the emergency because he or a person he represents as an agent was soliciting business or seeking to perform a service for remuneration;

(3) by a person who regularly administers care in a hospital emergency room; or

(4) by an admitting physician or a treating physician associated by the admitting physician of the patient bringing a health-care liability claim.

Civil Practice & Remedies Code, 69th Leg., R.S., ch. 959, § 1, sec. 74.001, 1985 Tex. Gen. Laws 3242, 3299 (amended 1993) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 74.151 (Vernon 2005)).

determination of who is licensed in the healing arts. We do not find *Hernandez* to be in any way inconsistent with our opinion. Because a rational juror could not have found that Shaw's conduct in shaking the baby and hitting its head against an object was reasonable emergency medical care or that Shaw was not licensed in the healing arts, the defense in question was not raised. Consequently, the trial court did not err in refusing to give the instruction requested by Shaw. We overrule Shaw's sole point on appeal.

The judgment is affirmed.

Justice VANCE dissenting.

BILL VANCE, Justice, dissenting.

With its reliance on *Wilson v. State* and application of a "rational-juror" test to the evidence to determine if an accused has the right to a defensive instruction, the majority applies the wrong test under Texas law and thus reaches the wrong result. *See Wilson v. State*, 777 S.W.2d 823, 825 (Tex.App.-Austin 1989), *aff'd*, 853 S.W.2d 547 (Tex.Crim.App.1993). *Wilson* was affirmed on other grounds, and neither the Court of Criminal Appeals nor any other Texas court of appeals has approved or adopted a rational-juror test, which in practice wrongly allows the judge—or judges—to weigh the relative credibility of the evidence.

The other two Texas cases cited by the majority neither mention nor apply a rational-juror test. *See Ferrel v. State*, 55 S.W.3d 586, 591 (Tex.Crim.App.2001); *Johnson v. State*, 157 S.W.3d 48, 50 (Tex. App.-Waco 2004, no pet.). Instead, they state and apply the well-established "raised-by-the-evidence" test discussed below. The two federal cases cited by the majority are not controlling.

Generally, when evidence from any source raises a defensive issue and the defendant properly requests a jury charge on that issue, the trial court must submit the issue to the jury. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex.Crim.App.1993) (citing *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Crim.App.1978)). The evidence that raises the issue may be strong, weak, contradicted, unimpeached, or unbelievable. *Muniz*, 851 S.W.2d at 254 (citing *Sanders v. State*, 707 S.W.2d 78, 80 (Tex.Crim.App. 1986)); *see also Ferrel*, 55 S.W.3d at 591 ("A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense."); *Johnson*, 157 S.W.3d at 50 (quoting *Ferrel* ). As we said in *East v. State:*

> A trial court must charge the jury on any defensive issue raised by the evidence, "regardless of its substantive character." *Brown v. State*, 955 S.W.2d 276, 279 (Tex.Crim.App.1997).

> A defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of whether it is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion that the testimony is not entitled to belief. The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge.

> *Id.* (quoting *Williams v. State*, 630 S.W.2d 640, 643 (Tex.Crim.App.1982)). This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence. [citation omitted] When a judge refuses to give an instruction on a defensive issue because the evidence supporting it is weak or unbelievable, he effectively substitutes his judgment on the weight of the evidence for that of the jury. [citation omitted] The weight of

the evidence in support of an instruction is immaterial.

*Id.* (quoting *Woodfox v. State,* 742 S.W.2d 408, 409–10 (Tex.Crim.App. 1987)).

*East v. State,* 76 S.W.3d 736, 737 (Tex. App.-Waco 2002, no pet.).

By applying the wrong test to the evidence, the majority's analysis and result are flawed. The evidence raised both elements of the defense on which Shaw requested an instruction.

Shaw testified how she ran through the house with the baby in a panic and how she performed CPR (emergency medical care) on the baby after calling 9–1–1. Dr. Hernandez thought—at least initially— that the injury was the result of aggressive cardio-pulmonary resuscitation. There thus was evidence that Shaw administered emergency medical care to the child in good faith and with reasonable care and that this care caused the child's injury. While the causation testimony was contradicted, that factor does not support the denial of Shaw's requested instruction; the first element of the defense was still raised by the evidence.

I also disagree with the majority's assertion that "the only reasonable conclusion that may be drawn from [Shaw's] testimony is that she is licensed as a physician assistant." She testified that she is a "medical assistant" and that she is "licensed." I agree with the majority that "medical assistants" are not licensed by the State; thus, her testimony is susceptible of two interpretations: (1) she is a medical assistant who is mistaken about being "licensed" or (2) she is mistaken about being a "medical assistant" when she is in fact a physician assistant who is licensed. I believe that the former is the more rational interpretation of her testimony. It seems a lot more likely that a medical assistant might believe that going

to school and graduating constituted a "license" than that a physician assistant, who is licensed, would describe herself as a "medical assistant." Regardless, this seemingly conflicting evidence raised this element of the defense.

Because there was some evidence that Shaw (1) administered emergency medical care to the child in good faith and with reasonable care and that this care caused the child's injury and (2) was not a person licensed in the healing arts, she was entitled to the requested defensive instruction. Because the majority applies an incorrect test and determines otherwise, I respectfully dissent.

## OPINION ON REHEARING.

JOHN G. HILL, Senior Justice.

In her motion for rehearing, Shaw joins the dissent in contending that we applied the wrong test in determining whether the defensive issue she argued at trial was raised by the evidence. She argues that we should have applied what she refers to as the "raised-by-the-evidence test." As we noted in the original opinion, the "rational-juror test" is the test used to determine whether, in fact, the defensive issue has been raised by the evidence. It is therefore a part of the "raised-by-the-evidence test," not a separate test. We again reject the argument that a defensive issue has been raised by the evidence even though, presuming the defensive evidence to be true, no rational juror could find for the defense based upon the evidence presented.

Shaw urges that we erred in holding that no evidence was presented from which a rational juror could conclude that shaking the complainant and causing its head to hit a surface, even a bed, was the result of emergency medical care administered in good faith and with reasonable care. She

refers us to evidence that she conducted CPR on the child and that she followed some instructions from the 911 operator in doing so. It is undisputed that Shaw conducted CPR and that she followed some instructions from the 911 operator in doing so. However, there is no evidence that Shaw's conduct of the CPR was reasonable, and there is no evidence that she was ever instructed by the 911 operator or anyone else to shake the baby and cause its head to hit against a hard surface or the surface of the bed.

Shaw suggests that Deputy Thompson, who was the initial officer at the scene, observed her conducting CPR and that at no time did he observe that the CPR was not being conducted in good faith and with reasonable care. Shaw's motion contains no record references to any place in the record where Deputy Thompson observes Shaw shaking the baby and hitting its head against a hard surface or the bed, and then expresses any opinion as to whether such conduct of CPR was reasonable. In fact, Deputy Thompson never expressed any opinion as to whether Shaw's conduct of CPR was conducted with reasonable care.

Finally, Shaw refers us to testimony given by the medical examiner when asked what happens when an infant is shaken and then hits its head on the bed padding. Among other things, the medical examiner replied that the only difference between hitting the baby's head against a hard surface and a surface such as the bed padding is that there is "less crushing injury of things outside the skull, so you may not see external bruising, you may not even see any bleeding under the scalp in the rare occasional case, but you will see still the accelerational injury with the brain and all its subdurals and that sort of thing." Shaw interprets the testimony as saying that shaking the baby and hitting

its head against an object, like a bed, could cause the injury sustained by the child in a rare case. We interpret the examiner's testimony as saying that only in a rare case would one not see any bleeding under the scalp when the baby is shaken and its head hit against an object. We believe that a rational jury could not interpret the testimony in the way Shaw seeks to interpret it. However, even if the jury were to reasonably interpret the testimony in the way suggested by Shaw, it still does not constitute any evidence that Shaw's shaking the baby and causing its head to hit an object consisted of emergency medical care administered in good faith and with reasonable care.

Shaw also suggests that we erred in holding that no rational jury could conclude from the evidence that she was not licensed in the healing arts. First, she refers us to section 204.003 of the Texas Occupation Code, which, among other things, provides that not every medical assistant or health care worker is required to hold a license as a physician assistant where one does not act as a physician assistant or represent to be one. She refers us to evidence that at trial neither she nor anyone else referred to her as a physician assistant, and that she signed consent forms at the hospital in her role as the complainant's grandmother, not as a physician assistant. None of these matters Shaw presents constitutes evidence from which a rational jury could conclude that she is not licensed, in view of her testimony that she was licensed.

Having shown that she was a licensed medical assistant, Shaw was obligated to present evidence showing that she was not licensed in the healing arts. As noted in the original opinion, she gave a very broad description of her duties, from which a reasonable juror could conclude that she was licensed in the healing arts. It is true

that a specific listing of what she did included tasks that arguably might not include the healing arts. However, one need not be licensed to perform those duties. Therefore, in view of her testimony that she was licensed, this did not constitute evidence from which a rational juror could conclude that Shaw was not licensed in the healing arts.

In answer to our suggestion that a jury would be required to resort to speculation in order to find from this evidence that Shaw was not licensed in the healing arts, Shaw refers us to a witness who testified that Shaw applied and received food stamps after she had lost her job. She also refers us to evidence obtained subsequent to trial from the internet website of the American Academy of Physician Assistants showing that the median annual income for a physician assistant in the United States was $67,734.00 in 2001. Shaw acknowledges that she had previously taken a voluntary leave of absence from the office of the physician for whom she had been employed. Shaw insists that a rational jury could conclude from this evidence that at the time of the occurrence in question she was an unemployed "medical assistant" on food stamps. Even if this is true, it does not constitute evidence from which a rational jury could conclude that Shaw was not licensed in the healing arts. First, there is no evidence that an unemployed "medical assistant" licensed in the healing arts, including a physician assistant, could not obtain food stamps if unemployed. Also, there is no evidence showing that one is no longer licensed in the healing arts when one becomes unemployed. We overrule Shaw's motion for rehearing.

Justice VANCE, dissenting on rehearing.

The majority opinion on rehearing continues to apply an incorrect "rational-ju-ror" test to the evidence to determine if an accused has the right to a defensive instruction. Moreover, in its discussion of the evidence, the opinion on rehearing fails to apply the correct standard of review. As the original majority opinion notes, the evidence should be viewed in the light most favorable to the defendant. *See Ferrel v. State,* 55 S.W.3d 586, 591 (Tex.Crim. App.2001); *Johnson v. State,* 157 S.W.3d 48, 50–52 (Tex.App.-Waco 2004, no pet.) (reversing and remanding case because self-defense was *raised by the evidence viewed in light most favorable to defendant* ). But the opinion on rehearing reviews and discusses the evidence in both a neutral light and in a light most favorable to the prosecution, rather than in the light most favorable to Shaw.

In her motion for rehearing, Shaw aptly distinguishes between an unlicensed "medical assistant" and a licensed "physician assistant" by pointing to the Physician Assistant Licensing Act, which provides:

(a) A person is not required to hold a license issued under this chapter to practice as:

(1) a technician, *assistant,* or employee of a physician who performs delegated tasks *but does not act as a physician assistant* or represent that the person is a physician assistant; or . . . .

TEX. OCC.CODE ANN. § 204.003(a)(1) (Vernon 2004) (emphasis added).

Shaw additionally asserts that if she were a licensed physician assistant, it would have been very unlikely for her to have called 9–1–1 for instructions on performing CPR. This argument, drawn from the evidence, additionally supports the conclusion that the jury could have found that she was a medical assistant who mis-

takenly thought she was licensed.[1]

I would reverse the judgment and remand the cause for a new trial.

1. Why the defense in section 22.04(k)(1)(B) is limited to a "person not licensed in the healing arts" (unless that person is working under the direction of a licensed physician) is baffling. Did the legislature actually intend to provide this defense only to a "person not licensed in the healing arts" who administers emergency medical care in good faith and with reasonable care? *See* TEX. PEN.CODE ANN. § 22.04(k)(1)(B) (Vernon 2003) (current version at *id.* § 22.04(k)(2) (Vernon Supp.2005)). Are Good Samaritans (other than licensed physicians or persons acting under the direction of a physician) who are licensed in the healing arts not entitled to this defense for their good-faith conduct in an emergency?

The purpose behind civil "Good Samaritan" laws is to increase the incentive for volunteers to provide emergency medical care by lowering the standard of care and exposure to liability. *See McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex.2003) ("we observe that the purpose of this statute is to increase the incentive for volunteers—and particularly physicians—to respond to medical emergencies"); *Pleasant Glade Assembly of God v. Schubert*, 174 S.W.3d 388, 396 (Tex.App.-Fort Worth 2005, pet. filed) ("the Good Samaritan statute ... provides that a person who in good faith administers emergency care is not liable in civil damages for an act performed during the emergency unless the act is wilfully and wantonly negligent. It is designed to offer protection to persons who voluntarily administer emergency care."); *Rosell v. Central West Motor Stages, Inc.*, 89 S.W.3d 643, 658 (Tex.App.-Dallas 2002, pet. denied) ("statute lowers the standard of care to encourage both certain medically-trained persons and laypersons to render aid in emergency situations"). The civil Good Samaritan statutes currently distinguish between licensed and unlicensed persons, apparently for professional medical liability purposes. *Compare* TEX. CIV. PRAC. & REM.CODE ANN. § 74.151 (Vernon 2005) *with id.* § 74.152. The prior statute had two sections as well: former section 74.001 ostensibly covered health care professionals who administered emergency care, while former section 74.002 covered "persons not licensed in the healing arts," including emergency medical service personnel. *See* Acts 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3299 (formerly codified at TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.001–.002). In 1985, emergency medical service personnel (such as paramedics or EMTs) were not licensed; but since 1999, they can now be licensed. *See* 25 TEX. ADMIN. CODE § 157.40 (2005); 24 Tex. Reg. 571, 1999 WL 49025 (1999) (section 157.40 effective Feb. 4, 1999). *But compare Moore v. Trevino*, 94 S.W.3d 723, 726–27 (Tex.App.-San Antonio 2002, pet. denied) (holding emergency medical service personnel are not persons licensed in healing arts), *with Wheeler v. Yettie Kersting Memorial Hosp.*, 866 S.W.2d 32, 50–51 (Tex.App.-Houston [1st Dist.] 1993, no writ) (parties and court assumed EMTs were persons licensed in healing arts).

When the defense at issue was added to section 22.04 in 1989, was the "person not licensed in the healing arts" language mistakenly imported from the civil Good Samaritan statutes without attention to its purpose in the civil liability context? *See* Acts 1989, 71st Leg., R.S., ch. 357, § 1, 1989 Tex. Gen. Laws 1442. One would reasonably think that, in passing former section 22.04(k)(1)(B), and despite the apparent language to the contrary, the legislature did not intend to discourage persons licensed in the healing arts (such as nurses and physician assistants) from providing emergency medical care when not under the direction of a licensed physician.