Shirley DUNLAP, Individually, as Heir to, as Personal Representative of, and on Behalf of all Wrongful Death Beneficiaries of the Estate of Era Sheppard Smith, Deceased, Appellant,

v.

Sandra R. YOUNG, James A. Greene, Jr., and Good Shepherd Hospital, Inc., d/b/a Good Shepherd Medical Center, Appellees.

No. 06–04–00124–CV.

Court of Appeals of Texas, Texarkana.

Submitted Dec. 14, 2005.

Decided March 3, 2006.

Jeremi K. Young, Jessica M. Dean, Rasansky Law Firm, for appellant.

Stephen A. Madsen, Cantey & Hanger, LLP, Fort Worth, Kenneth C. Cunningham, Longview, for appellees.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

When paramedic Sandra R. Young and emergency medical technician (EMT) James A. Greene, Jr., first encountered Era Sheppard Smith early on the morning of January 19, 2001, on a roadside in rural Marion County, Smith was in severe respiratory distress and looked to be oxygen-deprived. Even before the onset of her medical crisis, Smith had not been well. She suffered from end-stage renal disease, diabetes, hypertension, pulmonary embolism, and gastroesophageal reflux. At the time, she was due for dialysis and had fluid on her lungs.[1] During the crisis, Smith suffered respiratory and cardiac failure. Though a heartbeat was re-established, Smith ultimately died from the crisis.[2]

Shirley Dunlap, a daughter of Smith, brought a wrongful death and survivor action against Young, Greene, Good Shepherd Hospital, Inc., d/b/a Good Shepherd Medical Center, and Champion EMS, f/k/a EMS Directlink, claiming negligence in the treatment and care of Smith.[3] The defendants moved for summary judgment based

1. Earlier that morning, Smith had begun experiencing difficulty breathing. At 5:54 a.m., her daughter and son-in-law, the Martins, called 9–1–1 and arranged to meet an ambulance en route to the Linden Municipal Hospital. Smith was able to walk to the car under her own power. In the car on the way to meet the ambulance, however, Smith ceased responding to the Martins, and the Martins perceived that she had stopped breathing.

 At 6:07 a.m., the Martins met the ambulance on the side of FM 2685. At 6:08 a.m., Young and Greene documented their first contact with Smith. Their initial assessment of Smith was done in the dark while Smith was in the back of the Martins' car. Young and Greene noted that, while Smith had not stopped breathing, she was in respiratory distress or respiratory failure, having only four to six breaths per minute. Young and Greene noted that she was cyanotic, meaning she appeared to be oxygen-deprived as indicated by her color. They also learned Smith was due for dialysis and had pulmonary edema (fluid on the lungs). She was also described as having congestive heart failure.

2. The record establishes the following sequence of events as depicted from affidavits and the "run sheet," documenting the ambulance dispatch and transport.

 | | |
 |---|---|
 | 5:54 a.m. | Call received. |
 | 5:57 | Ambulance en route. |
 | 6:07 | Ambulance meets Martins and Smith on side of road. |
 | 6:08 | Ambulance personnel document first contact with Smith. She is taken out of the back of the car and placed on a cot. Smith placed on a nonrebreather to provide supplemental oxygen. Young continues her assessment of Smith's condition. |
 | 6:09 -6:10 | One to two minutes after being placed on the nonrebreather, Smith stops breathing. After that, Young "bagged" Smith, meaning that she applied a bag-valve mask (BVM) to assist Smith's ventilation and oxygenation. |
 | 6:10 | Smith placed on a cardiac monitor, showing a heart rate of 38. |
 | 6:11 | Ambulance en route to hospital. |
 | 6:12 | Smith goes into asystole, meaning that there was no electrical activity in the heart. CPR started. |
 | 6:18 | Intubation attempted, failed. Smith continues in cardiac arrest. |
 | 6:20 | Ambulance stopped, and driver EMT Greene successfully intubates Smith. |
 | 6:26 | Arrival at Linden Municipal Hospital with a noted heart rate of 28. |

 Smith was briefly treated at Linden Municipal Hospital before being airlifted to Good Shepherd Medical Center in Longview. She was kept alive by a ventilator until February 11, 2001, when the family decided to remove life support.

3. In a 2002 report, Lawrence Hess, a nurse practitioner and paramedic opining at Dunlap's request, stated that Young and Greene were negligent in (1) failing to initially stabilize the airway before transport, (2) failing to promptly intubate a patient in respiratory arrest, (3) failing to give Atropine and Epinephrine when both were clearly indicated, and (4) failing to timely transport a critically ill patient to the hospital for a higher level of care. Dunlap's allegations mirror Hess' assessment,

on application of the so-called "Good Samaritan" statute and on the lost chance of survival doctrine. *See* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3299, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 864 (formerly TEX. CIV. PRAC. & REM.CODE ANN. § 74.002, current version at TEX. CIV. PRAC. & REM.CODE ANN. § 74.152 (Vernon 2005)). The trial court granted their motion. We affirm because the Good Samaritan provision applies and defendants were conclusively shown not to have been willfully and wantonly negligent.

*(1) The Good Samaritan Provision Applies to Emergency Medical Personnel Because Emergency Medical Services Are Properly Excluded from the Definition of the Healing Arts as Used in that Provision*

This case calls on the Court to determine whether the Good Samaritan provision applies to these defendants. More specifically, we must determine whether emergency medical services (EMS) personnel are licensed in "the healing arts" as that phrase is used in the former Section 74.002[4] of the Texas Civil Practice and Remedies Code. Our decision will affect the standards by which Texas courts will address allegations of EMS personnel negligence. If EMS personnel are "not licensed in the healing arts" as that phrase is used in the Good Samaritan provision, the provision applies to them and thus affords them the higher liability threshold of "willful and wanton negligence," rather than the standard threshold of ordinary negligence.

The San Antonio Court of Appeals has, under similar facts, applied the Good Samaritan provision to EMS personnel. *See Moore v. Trevino,* 94 S.W.3d 723 (Tex. App.-San Antonio 2002, pet. denied). Dunlap invites this Court to disagree with our sister court. We decline the invitation.

■ In our analysis, we apply traditional tenets of statutory construction, look to the surrounding statutory structure and treatment of related professions under various codes, and examine the substantive provisions of those codes to conclude that, in fact, EMS personnel are not licensed in the healing arts and, thus, enjoy the protection of the former Section 74.002.

The Texas Civil Practice and Remedies Code does not define "healing arts" as it would apply to the former Section 74.002. The only available statutory definition we find of "healing art" comes from the Texas Occupations Code:

> The healing art includes any system, treatment, operation, diagnosis, prescription, or practice to ascertain, cure, relieve, adjust, or correct a human disease, injury, or unhealthy or abnormal physical or mental condition.

TEX. OCC.CODE ANN. § 104.002 (Vernon 2004). At first glance, the duties of EMS personnel would appear to fall within this broad definition. Further analysis, however, undermines such a result. We conclude EMS personnel do not fall within the definition.

Our sister court in *Moore* came to the same conclusion based largely on its reading of two provisions from the Texas Occupations Code. *Moore,* 94 S.W.3d at 728.

adding the allegation that the EMS personnel were negligent in their "failure to . . . record pulse oxymetry."

**4.** Effective September 1, 2003, the former Section 74.002 was renumbered as Section 74.152 and slightly amended. The former Section 74.002 is applicable to this case since Dunlap filed her suit before September 1, 2003.

First, the court looked to the above-quoted definition of healing arts. *Id.* at 727. Second, it examined the very next provision specifically addressing identification of certain persons licensed in the healing arts. *Id.* Because EMS personnel were not listed among those professions for which the statute mandated certain identifying letters, the *Moore* court concluded that EMS personnel were not among those licensed in the healing arts. *Id.* While we agree that this exclusion is some indication EMS personnel are not considered licensed in the healing arts, we think there are other, more persuasive, reasons for this conclusion.

*(a) Properly Interpreted, the Good Samaritan Provision, Itself, Excludes Emergency Medical Services from the Healing Arts*

The former Section 74.002 provided the following:

Persons *not licensed in the healing arts* who in good faith *administer emergency care as emergency medical service personnel* are not liable in civil damages for an act performed in administering the care unless the act is wilfully or wantonly negligent. This section applies *without regard to whether the care is provided for or in expectation of remuneration.*

Act of May 17, 1985 (emphasis added). To paraphrase the former Section 74.002, when people render emergency care in the role of "emergency medical service personnel," regardless of their expectation of payment, they will not be liable for that care unless "wilfully or wantonly negligent," so long as they are "not licensed in the healing arts." Necessarily under the statute, some people [5] can provide care as

EMS personnel, yet not be licensed in the healing arts. Logically, for EMS personnel to fall within the statute, either they must not be licensed or their license is not considered to be "in the healing arts." We believe the statutory language suggests the latter, that is, EMS personnel are not "licensed in the healing arts."

If we were to include emergency medical services within the "healing arts," we would provide the statute's protection to only unlicensed or uncertified EMS personnel. Section 773.041 of the Texas Health and Safety Code prohibits the practice of emergency medical services without certification in accordance with the code. *See* TEX. HEALTH & SAFETY CODE ANN. § 773.041(b) (Vernon 2003). Dunlap's proposed interpretation of former Section 74.002—that emergency medical services fall within the definition of the healing arts—would mean that the protection offered by Section 74.002 is available only to those EMS personnel who are not properly certified and, nevertheless, perform emergency medical services. That would be nonsensical.

We must presume that the Legislature intended a just and reasonable result by enacting this provision and must avoid construction of a statute that produces an absurd result. *See* TEX. GOV'T CODE ANN. § 311.021(3) (Vernon 2005); *Sharp v. House of Lloyd, Inc.,* 815 S.W.2d 245, 249 (Tex.1991). Most certainly, the Legislature did not intend to protect those who violate Section 773.041 by "posing" as EMS personnel and to exclude from protection those people properly certified to provide emergency medical services. Dunlap's interpretation overlooks the Texas Health and Safety Code's mandatory

---

**5.** The set of people referenced by the statute could include either actual EMS personnel or non-EMS personnel who are nonetheless providing such emergency care. But since the case before us obviously deals with EMS personnel, we confine our analysis to that subgroup.

certification. In our interpretation of a statute, we are to assume that each provision has meaning and that no provision is superfluous. *See* TEX. GOV'T CODE ANN. § 311.021(2) (Vernon 2005); *Laidlaw Waste Sys. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex.1995).

When asked at oral argument to which class of persons Section 74.002 would apply, if not to Young and Greene, Dunlap suggested the provision applies to volunteer EMS personnel who receive only reimbursement of expenses. We see three flaws in this suggestion. First, such a distinction ignores the clearly stated intent of the Good Samaritan provision that remuneration or the expectation of remuneration is not to be considered when deciding whether the provision applies to the given circumstances. *See* Act of May 17, 1985. Again, we must presume the Legislature intended the entire statute to be effective. *See* TEX. GOV'T CODE ANN. § 311.021(2).

Also, we find no provision which distinguishes between the certification of volunteer EMS personnel and those who are paid. Even an EMS volunteer must be certified or licensed before he or she may legally perform emergency medical services. *See* TEX. HEALTH & SAFETY CODE ANN. § 773.041 (Vernon 2003).

Finally, the Legislature has specifically defined "[e]mergency medical services volunteers" as "emergency medical services personnel who provide emergency prehospital care without remuneration, except reimbursement for expenses." TEX. HEALTH & SAFETY CODE ANN. § 773.003(13) (Vernon Supp.2005). Therefore, it is reasonable to conclude that, had the Legislature intended the Good Samaritan provision to apply to only those volunteers, it would have used the specific term "emergency medical services volunteer" rather than the more general term "emergency medical services personnel."

*(b) General Statutory Structure and Treatment Supports Excluding Emergency Medical Services from the Healing Arts*

A general survey of Title 3 of the Texas Occupations Code makes it clear that the term "healing arts" is treated as nearly synonymous with "health professions" or "the practice of medicine." Those professions considered to be among the healing arts are addressed at length in Title 3 of the Texas Occupations Code. Title 3 specifically addresses a number of "other health professions." Notably, EMS personnel are not addressed among these very specific provisions. *See Lenhard v. Butler*, 745 S.W.2d 101, 105 (Tex.App.-Fort Worth 1988, writ denied) (applying rule of statutory construction that "the express mention of one person, thing, consequence or class is tantamount to the express exclusion of all others").

By contrast, the definition, licensure requirements, and other legislative mandates for those working in the emergency medical services field are treated, not in Title 3 of the Texas Occupations Code, but in Chapter 773 of the Texas Health and Safety Code, which is devoted specifically to emergency medical services. Here, we apply the *Moore* approach, but in a more global manner. That is, not only does Section 104.003 of the Texas Occupations Code fail to mention EMS personnel, as *Moore* points out, but the entire code, very thorough as to several health professions, fails to address EMS personnel. *See* TEX. OCC.CODE ANN. § 104.003 (Vernon 2004). This omission suggests the Legislature considers EMS personnel different from those that practice medicine and, thus, would exclude them from "the healing arts."

*(c) Other Statutes Reveal a Legislative Distinction Between Emergency Medical*

*Personnel and Those Licensed in the Healing Arts*

This suggestion is confirmed by the several distinctions found in a variety of sections of the Texas Occupations Code and the Texas Health and Safety Code. For instance, Section 773.041 of the Texas Health and Safety Code requires EMS personnel to be properly licensed or certified. TEX. HEALTH & SAFETY CODE ANN. § 773.041. But these licensure and monitoring requirements vary significantly from those imposed by the Texas Occupations Code on other healthcare professionals. *Compare* TEX. HEALTH & SAFETY CODE ANN. §§ 773.041–.050 (Vernon 2003 & Supp.2005), *with* TEX. OCC.CODE ANN. §§ 155.001–.058, 164.010, 164.051–.061 (Vernon 2004 & Supp.2005).

Additionally, and perhaps more notably, Chapter 773 of the Texas Health and Safety Code, dedicated exclusively to emergency medical services, specifically excludes physicians and nurses from coverage under the chapter, absent certain circumstances:

(a) This chapter does not apply to:

. . . .

(5) a physician, registered nurse, or other health care practitioner licensed by this state unless the health care practitioner staffs an emergency medical services vehicle regularly.

TEX. HEALTH & SAFETY CODE ANN. § 773.004(a)(5) (Vernon Supp.2005).

Further, EMS personnel must work under the supervision of a physician:

(a) The provision of advanced life support must be under medical supervision and a licensed physician's control.

(b) The provision of basic life support may be under medical supervision and a licensed physician's control.

TEX. HEALTH & SAFETY CODE ANN. § 773.007 (Vernon 2003). Advanced life support is described as "emergency prehospital care that uses invasive medical acts." *See* TEX. HEALTH & SAFETY CODE ANN. § 773.003(1) (Vernon Supp.2005). Section 773.043 further explains that advanced life support includes medical acts such as endotracheal intubation. *See* TEX. HEALTH & SAFETY CODE ANN. § 773.043.[6] Since it is clear that such procedures were properly available here, we proceed with the understanding that medical supervision was mandatory with respect to the care administered to Smith. This conclusion is consistent with the structure and duties of EMS personnel as described by Young.

This "medical supervision" refers specifically to "direction given to [EMS] personnel by a licensed physician under Subtitle B, Title 3, Occupations Code, and the rules adopted under that subtitle by the Texas State Board of Medical Examiners." TEX. HEALTH & SAFETY CODE ANN. § 773.003(18) (Vernon Supp.2005). Specifically, even a licensed paramedic, the most highly classified EMS person,[7] must work under certain protocols. TEX. HEALTH & SAFETY CODE ANN. § 773.0495.

The record refers to such supervision in terms of field protocols. Young explained that EMS personnel follow guidelines or field protocols in caring for patients and

---

**6.** Basic life support is described as "emergency prehospital care that uses noninvasive medical acts." *See* TEX. HEALTH & SAFETY CODE ANN. § 773.003(2) (Vernon Supp.2005).

**7.** "Emergency medical services personnel" means: (A) emergency care attendant; (B)

emergency medical technicians; (C) emergency medical technicians—intermediate;

(D) emergency medical technicians—paramedic; or (E) licensed paramedic. TEX. HEALTH & SAFETY CODE ANN. § 773.003(10) (Vernon Supp.2005).

that these protocols are generated and distributed to the personnel by the "medical control doctor." Young recounted in-service sessions covering changes in protocols, recalled that her medical control doctor supervised at least one of these sessions, and explained that, as a paramedic, she "work[s] under medical control license and perform[s] patient care under the guidelines of our medical control." From Young's deposition, we learn that protocols provide a series of steps to be followed in the treatment of certain conditions or ailments and that EMS personnel maintain a binder of protocols on which they are trained and of those protocols revised or updated. Young stated that she was knowledgeable in the protocols and that she adhered to those protocols in her treatment of patients, and agreed that a reasonable and prudent EMS provider should do so. While the record does not contain a copy of protocols relevant to the case at hand, it is clear that such protocols provide specific guidance in the emergency treatment of patients and that, through such protocols, a licensed physician directs such care in a manner consistent with Section 773.007 of the Texas Health and Safety Code.

Since EMS personnel providing the level of services rendered in this case must and did operate under the supervision of a licensed physician, we find it inconsistent with this statutory arrangement to ignore distinctions drawn by respective code provisions. The substance and effect of several provisions of the Texas Occupations Code and the Texas Health and Safety Code support the conclusion that licensed EMS personnel are not licensed in the healing arts as intended by former Section 74.002 of the Texas Civil Practice and Remedies Code.

*(d) Decisions from Sister Courts Further Support Excluding Emergency Medical Services from the Healing Arts*

Our conclusion is consistent with *Moore* and other decisions from our sister courts. Before *Moore*, the Houston First Court of Appeals took a similar position on the matter, albeit a less direct one. In *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32 (Tex. App–Houston [1st Dist.] 1993, no writ), the court assumed, without expressly deciding, that former Section 74.002 applied to the EMS personnel involved in that case. In *Wheeler*, unlike the case in *Moore*, the court concluded that the evidence was sufficient to raise a fact issue regarding whether those EMS defendants acted with willful or wanton negligence. *Id.* at 51. Therefore, the court reversed the trial court's summary judgment in favor of the EMTs. *Id.*

Our conclusion is also consistent with the Waco court's opinion in *Shaw* in which the court had to determine whether a criminal defendant could use a defense similar to that found in the Good Samaritan provision. *See Shaw v. State*, 181 S.W.3d 450 (Tex.App.-Waco 2005, pet. filed). Shaw, a licensed [8] physician's assistant, charged with injury to a child, asserted that the injuries occurred while Shaw was performing CPR on the child and thus asserted the criminal law's equivalent of former Section 74.002: "It is a defense to prosecution under this section that the act or omission consisted of ... emergency medical care administered in good faith and with reasonable care *by a person not licensed in the healing arts*." *See* TEX. PEN.CODE ANN. § 22.04(k)(2) (Vernon Supp.

---

**8.** The court notes that Shaw may not have been actually licensed. Shaw testified that she was licensed, but the court indicates the contrary: "We recognize the possibility that, despite her testimony, Shaw may be an unlicensed medical assistant who performs only routine tasks in the office to assist the physician." *Shaw*, 181 S.W.3d 450.

2005) (emphasis added) (formerly Tex. Pen. Code Ann. § 22.04(k)(1)(B)). Shaw pointed to *Moore* to support her argument that she fell within the definition of "a person not licensed in the healing arts." *Shaw*, 181 S.W.3d 450. Careful to point out that *Moore* "is not in conflict with this decision," the Waco court rejected Shaw's argument, concluding that Shaw was, in fact, licensed in the healing arts and could not use Section 22.04(k)'s provisions. *Id.* The court explained that "a licensed physician assistant . . . is engaged in the practice of medicine under supervision of a physician and, *unlike an emergency medical technician,* is a healthcare provider." *Id.* (citing Tex. Occ.Code Ann. §§ 152.003(a)(1)(J), 204.204 (Vernon 2004)) (emphasis added).[9] The court also pointed to the distinctions between the job duties of EMS personnel and a physician's assistant to further distinguish the facts of *Moore*. *Shaw*, 181 S.W.3d 450.

We conclude that Young and Greene were "not licensed in the healing arts" and, thus, fell within the protection of the Good Samaritan provision.[10] The next question is whether the summary judgment evidence raises a fact question as to whether their care of Smith was willfully or wantonly negligent.

*(2) The Evidence Conclusively Establishes that Defendants Did Not Violate the Good Samaritan Provision's Willful–or–Wanton–Negligence Standard*

In support of their motion for summary judgment, defendants submitted affidavits of Dunlap's experts and of both Young and Greene. Hess' deposition, in particular, leads to the conclusion that neither Young nor Greene acted with willful and wanton negligence.

■ Though there have been few court opinions on this standard as it applies to the Good Samaritan laws, *Wheeler* directly addresses the issue in a summary judgment · context. In *Wheeler*, the Corpus Christi court reversed and remanded a summary judgment granted in favor of the defendants, concluding there were fact issues concerning whether the defendants

---

**9.** "(1) 'Direct provider of health care' includes . . . a physician assistant." Tex. Occ. Code Ann. § 152.003(a)(1)(J). "A physician assistant shall be supervised by a supervising physician. A physician assistant may have more than one supervising physician. The supervising physician oversees the activities of, and accepts responsibility for, medical services provided by the physician assistant." Tex. Occ.Code Ann. § 204.204(a).

**10.** Effective September 1, 2003, the substance of former Section 74.002 was renumbered as Section 74.152. The 2003 amendment also made one substantive change to the provision, making the provision applicable to "[p]ersons not licensed *or certified* in the healing arts." Tex. Civ. Prac. & Rem.Code Ann. § 74.152 (emphasis added to note change). Of course, this amendment is helpful to our analysis only to the extent it indicates legislative intent, since this amended provision is not at issue here. A law review article addressing the changes brought about by House Bill 4 took the posi-

tion that this amendment "harmonizes the statutory language with the San Antonio Court of Appeals' decision in *Moore v. Trevino*," 94 S.W.3d 723, 727 (Tex.App.-San Antonio 2002, no pet.). *See* Michael S. Hull et al., *House Bill 4 and Proposition 12: An Analysis with Legislative History*, 36 Tex. Tech L.Rev. 2, 267 (Supp.2005).

One could argue that the addition indicates just the opposite: that the amendment meant to exclude EMS personnel since they are, in fact, certified rather than licensed. Under this reading, this statute indicates that a person can be certified in the healing arts and may be excluded from Section 74.152's protection. The Waco court seemingly adopts this reading in *Shaw*: "[H]owever, in another statute the legislature has subsequently provided that even certified medical workers are involved in the healing arts." *Shaw*, 181 S.W.3d 450 (citing Tex. Civ. Prac. & Rem.Code Ann. § 74.152).

had acted with willful and wanton negligence. *Wheeler* explains the standard:

> "Heedless and reckless disregard," sometimes termed "willful act or omission" or "willful and wanton disregard," means "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *See Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 916–20 (Tex. 1981). It is synonymous with "gross negligence." *Id.* at 920.

*Wheeler,* 866 S.W.2d at 50 n. 25. The court pointed to a great deal of evidence in *Wheeler* that raised a fact issue regarding whether the EMS personnel acted with willful or wanton negligence in the stillbirth of an infant occurring during a ninety-mile transport of a mother in advanced labor. Among that evidence was the following:

> The deposition of EMT Koehler who stated that (1) he believed Wheeler would deliver en route based on the increasing intensity and shorter spacing of her contractions; (2) he had the authority to refuse to transport her to John Sealy but did so anyway; (3) he knew how to maintain an airway for the baby but chose not to do so for fear of causing the mother to tear and bleed to death; (4) the EMTs had a limited amount of training in breech births; (5) there were other hospitals along their route to Galveston but they did not consider taking the patient to any of them. The deposition of EMT Davis who stated (1) he was taught how to maintain an airway for the baby in a breech birth; (2) he was supposed to perform the procedure if he had a question about whether the baby was getting air; (3) he would consider the situation with Mrs. Wheeler a time when the maneuver was appropriate; (4) he realized that failure to perform the maneuver would result in the baby's oxygen deprivation and death; (5) he and Koehler discussed performing the procedure but he made no attempt to do so.

> The deposition of Dr. Rodriguez who stated that (1) the action of EMT Davis in tearing the amniotic sac open was "completely wrong" and speeded up the delivery; (2) the proper procedure when the water breaks is to have the patient lie quietly and avoid rupturing the membranes; (3) in reasonable medical probability, had the EMTs followed the proper procedure, there would have been time for Life Flight to arrive and take Mrs. Wheeler to John Sealy; (4) as Mrs. Wheeler's labor became more intense, the EMTs should have stopped at one of the several other hospitals en route to have Mrs. Wheeler rechecked.

*Id.* at 50–51 (footnote omitted). This evidence was held sufficient to raise a fact question as to whether the EMS personnel in *Wheeler* acted with willful or wanton negligence. Having determined that the former Section 74.002 applies to the instant case, we must now measure the emergency care administered by Young and Greene in this case by the willful and wanton negligence standard.

*(a) Failure to Stabilize an Airway Before Transport and Failure to Promptly Intubate*

 Hess stated that patients in respiratory distress "require[ ] rapid airway intervention" and should be administered "supplemental high oxygen." He added that such supplemental oxygen is administered through a nonrebreather mask. Young did exactly this and did so before transport.

Hess also explained that "[a]ssisted respiration should be done for patients in

respiratory failure" and that this is "usually done with a BVM." Young did just this.

Hess goes on to explain that he thinks the BVM should have been used while Smith was in respiratory failure (before she went into arrest). He further notes that "definitely" the standard of care with respect to a patient in respiratory arrest would dictate use of a BVM. Again, this was done for Smith. At most, Hess stated that Young should have used a BVM a bit sooner than she did.

Patients can be appropriately ventilated using a BVM. Hess goes on to explain that it can also adequately oxygenate the patient on a short-term basis "with appropriate usage." As Young explained, "You can have an open, patent airway which is able to receive oxygen ... without intubation."

Dunlap specifically alleged that Young and Greene failed to stabilize the airway before transport. According to Hess, however, this can be accomplished through use of a BVM. This testimony is hard to reconcile with Dunlap's allegations regarding failure to intubate. However, in a previous letter, he explained that endotracheal intubation is the "preferred method." Hess conceded there is no evidence here that Smith was not properly ventilated through use of the BVM. He did not state the same with respect to proper oxygenation since it requires adequate circulation.

*(b) "Prior to Transport": The Role of Emergency Care*

Hess explained that there are competing schools of thought with respect to the role of emergency care. One school of thought favors treatment and stabilization of the patient before transport, under the assumption that, most often, it is easier to work outside the cramped quarters of an ambulance and have the benefit of both attending EMS personnel, rather than just the one who is not driving. Hess referred to this approach as the "stay and play" approach and seems to be a proponent of this approach. The so-called "scoop and run" approach, on the other hand, favors rapid transport to higher care. Any necessary procedures that can be done en route, according to this school of thought, should be done en route. Young, it seems, tends to practice this approach.

Many of Hess' criticisms of Young's care seem to center around the debate on these two approaches. That is, Hess is of the opinion that, had Young and Greene treated Smith sooner, perhaps before transport, Smith's condition might have improved. Young explained that her objective was getting the very critical Smith to the hospital for a higher level of care. Hess conceded that intubation is a process that can be done en route to the hospital and whether to do so can be "a judgment call[ ]." The Good Samaritan law seeks to protect such judgment calls.

Young indicated she knew Smith required intubation two to three minutes after her secondary assessment in the ambulance. But, since Smith was so ill in so many ways and considering that Young was continuing CPR and a method of ventilation, which Hess admitted was acceptable, Young's failure to immediately intubate does not rise to the level of willful or wanton negligence. Again, Hess himself admitted there was no evidence that the BVM was not properly ventilating Smith.

*(c) Failure to Administer Cardiac Medications*

Greene[11] stated that he and Young did not discuss the administration of the cardiac medications as a viable treatment, as the EMS personnel in *Wheeler* had done.

---

**11.** Greene was classified as an EMT–Intermediate. As a result, he was not certified to give medication, and therefore is not a proper target with respect to this specific allegation.

So, there is no proof here that Young and Greene failed to do what they knew should have been done. Rather, Young and Green acted in a hurry and, as Young explains, were trying to get the very critically ill Smith to the hospital without delay.

Young explained that she would have had to stop compressions and ventilation in order to have administered the cardiac medications. Hess conceded that it would have been below the standard of care to halt CPR to administer the medications when the patient is as near to the hospital as was the case here, especially when that patient is suffering from congestive heart failure and pulmonary edema. Hess also explained that chest compressions and ventilation are "as important" as the medications. We also note that Young was successful to an extent in restarting Smith's heart, having regained a "sinus brady rhythm" which, Hess agreed, was a good sign for a person who had been in asystole. Hess also explained that there may be some question as to whether the administration of the medications through the endotracheal tube would have been effective since Smith was suffering from pulmonary edema.

In sum, Hess takes the position that, if Young and Greene had intubated sooner it, "might have improved the condition." Hess maintains that nothing that was done on the ambulance run caused Smith to go into asystole. He also testified that Young and Greene were "definitely not" out to harm Smith and that he does not contend the two did not care for Smith. Notably, Hess agreed that, even if they were negligent, Young and Greene were trying to save Smith.

The record raises no question as to whether Young and Greene were willfully or wantonly negligent. We conclude that the appellees here conclusively established

the former Section 74.002 as an affirmative defense.

Therefore, we affirm the trial court's summary judgment.