In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00124-CV
______________________________


SHIRLEY DUNLAP, INDIVIDUALLY, AS HEIR TO,
AS PERSONAL REPRESENTATIVE OF, AND ON
BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES
OF THE ESTATE OF ERA SHEPPARD SMITH, DECEASED, Appellant
 
V.
 
SANDRA R. YOUNG, JAMES A. GREENE, JR.,
AND GOOD SHEPHERD HOSPITAL, INC., D/B/A
GOOD SHEPHERD MEDICAL CENTER, Appellees


                                              

On Appeal from the 115th Judicial District Court
 Marion County, Texas
Trial Court No. 0200222


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N
            When paramedic Sandra R. Young and emergency medical technician (EMT) James A.
Greene, Jr., first encountered Era Sheppard Smith early on the morning of January 19, 2001, on a
roadside in rural Marion County, Smith was in severe respiratory distress and looked to be oxygen-deprived. Even before the onset of her medical crisis, Smith had not been well. She suffered from
end-stage renal disease, diabetes, hypertension, pulmonary embolism, and gastroesophageal reflux. 
At the time, she was due for dialysis and had fluid on her lungs.


 During the crisis, Smith suffered
respiratory and cardiac failure. Though a heartbeat was re-established, Smith ultimately died from
the crisis.



            Shirley Dunlap, a daughter of Smith, brought a wrongful death and survivor action against
Young, Greene, Good Shepherd Hospital, Inc., d/b/a Good Shepherd Medical Center, and Champion
EMS, f/k/a EMS Directlink, claiming negligence in the treatment and care of Smith.


 The
defendants moved for summary judgment based on application of the so-called "Good Samaritan"
statute and on the lost chance of survival doctrine. See Act of May 17, 1985, 69th Leg., R.S., ch.
959, § 1, 1985 Tex. Gen. Laws 3242, 3299, amended by Act of June 2, 2003, 78th Leg., R.S., ch.
204, § 10.01, 2003 Tex. Gen. Laws 847, 864 (formerly Tex. Civ. Prac. & Rem. Code Ann. §
74.002, current version at Tex. Civ. Prac. & Rem. Code Ann. § 74.152 (Vernon 2005)). The trial
court granted their motion. We affirm because the Good Samaritan provision applies and defendants
were conclusively shown not to have been willfully and wantonly negligent.
(1)       The Good Samaritan Provision Applies to Emergency Medical Personnel Because
Emergency Medical Services Are Properly Excluded from the Definition of the Healing Arts
as Used in that Provision
            This case calls on the Court to determine whether the Good Samaritan provision applies to
these defendants. More specifically, we must determine whether emergency medical services (EMS)
personnel are licensed in "the healing arts" as that phrase is used in the former Section 74.002


 of
the Texas Civil Practice and Remedies Code. Our decision will affect the standards by which Texas
courts will address allegations of EMS personnel negligence. If EMS personnel are "not licensed
in the healing arts" as that phrase is used in the Good Samaritan provision, the provision applies to
them and thus affords them the higher liability threshold of "willful and wanton negligence," rather
than the standard threshold of ordinary negligence.
            The San Antonio Court of Appeals has, under similar facts, applied the Good Samaritan
provision to EMS personnel. See Moore v. Trevino, 94 S.W.3d 723 (Tex. App.—San Antonio 2002,
pet. denied). Dunlap invites this Court to disagree with our sister court. We decline the invitation.
            In our analysis, we apply traditional tenets of statutory construction, look to the surrounding
statutory structure and treatment of related professions under various codes, and examine the
substantive provisions of those codes to conclude that, in fact, EMS personnel are not licensed in
the healing arts and, thus, enjoy the protection of the former Section 74.002.
            The Texas Civil Practice and Remedies Code does not define "healing arts" as it would apply
to the former Section 74.002. The only available statutory definition we find of "healing art" comes
from the Texas Occupations Code:
The healing art includes any system, treatment, operation, diagnosis,
prescription, or practice to ascertain, cure, relieve, adjust, or correct a human disease,
injury, or unhealthy or abnormal physical or mental condition.

Tex. Occ. Code Ann. § 104.002 (Vernon 2004). At first glance, the duties of EMS personnel would
appear to fall within this broad definition. Further analysis, however, undermines such a result. We
conclude EMS personnel do not fall within the definition.
            Our sister court in Moore came to the same conclusion based largely on its reading of two
provisions from the Texas Occupations Code. Moore, 94 S.W.3d at 728. First, the court looked to
the above-quoted definition of healing arts. Id. at 727. Second, it examined the very next provision
specifically addressing identification of certain persons licensed in the healing arts. Id. Because
EMS personnel were not listed among those professions for which the statute mandated certain
identifying letters, the Moore court concluded that EMS personnel were not among those licensed
in the healing arts. Id. While we agree that this exclusion is some indication EMS personnel are not
considered licensed in the healing arts, we think there are other, more persuasive, reasons for this
conclusion.
            (a)       Properly Interpreted, the Good Samaritan Provision, Itself, Excludes Emergency
Medical Services from the Healing Arts
            The former Section 74.002 provided the following:
Persons not licensed in the healing arts who in good faith administer emergency care
as emergency medical service personnel are not liable in civil damages for an act
performed in administering the care unless the act is wilfully or wantonly negligent. 
This section applies without regard to whether the care is provided for or in
expectation of remuneration.

Act of May 17, 1985 (emphasis added). To paraphrase the former Section 74.002, when people
render emergency care in the role of "emergency medical service personnel," regardless of their
expectation of payment, they will not be liable for that care unless "wilfully or wantonly negligent,"
so long as they are "not licensed in the healing arts." Necessarily under the statute, some people


 can
provide care as EMS personnel, yet not be licensed in the healing arts. Logically, for EMS personnel
to fall within the statute, either they must not be licensed or their license is not considered to be "in
the healing arts." We believe the statutory language suggests the latter, that is, EMS personnel are
not "licensed in the healing arts."
            If we were to include emergency medical services within the "healing arts," we would
provide the statute's protection to only unlicensed or uncertified EMS personnel. Section 773.041
of the Texas Health and Safety Code prohibits the practice of emergency medical services without
certification in accordance with the code. See Tex. Health & Safety Code Ann. § 773.041(b)
(Vernon 2003). Dunlap's proposed interpretation of former Section 74.002—that emergency medical
services fall within the definition of the healing arts—would mean that the protection offered by
Section 74.002 is available only to those EMS personnel who are not properly certified and,
nevertheless, perform emergency medical services. That would be nonsensical.
            We must presume that the Legislature intended a just and reasonable result by enacting this
provision and must avoid construction of a statute that produces an absurd result. See Tex. Gov't
Code Ann. § 311.021(3) (Vernon 2005); Sharp v. House of Lloyd, Inc., 815 S.W.2d 245, 249 (Tex.
1991). Most certainly, the Legislature did not intend to protect those who violate Section 773.041
by "posing" as EMS personnel and to exclude from protection those people properly certified to
provide emergency medical services. Dunlap's interpretation overlooks the Texas Health and Safety
Code's mandatory certification. In our interpretation of a statute, we are to assume that each
provision has meaning and that no provision is superfluous. See Tex. Gov't Code Ann.
§ 311.021(2) (Vernon 2005); Laidlaw Waste Sys. v. City of Wilmer, 904 S.W.2d 656, 659 (Tex.
1995).
            When asked at oral argument to which class of persons Section 74.002 would apply, if not
to Young and Greene, Dunlap suggested the provision applies to volunteer EMS personnel who
receive only reimbursement of expenses. We see three flaws in this suggestion. First, such a
distinction ignores the clearly stated intent of the Good Samaritan provision that remuneration or the
expectation of remuneration is not to be considered when deciding whether the provision applies to
the given circumstances. See Act of May 17, 1985. Again, we must presume the Legislature
intended the entire statute to be effective. See Tex. Gov't Code Ann. § 311.021(2).
            Also, we find no provision which distinguishes between the certification of volunteer EMS
personnel and those who are paid. Even an EMS volunteer must be certified or licensed before he
or she may legally perform emergency medical services. See Tex. Health & Safety Code Ann.
§ 773.041 (Vernon 2003).
            Finally, the Legislature has specifically defined "[e]mergency medical services volunteers"
as "emergency medical services personnel who provide emergency prehospital care without
remuneration, except reimbursement for expenses." Tex. Health & Safety Code Ann.
§ 773.003(13) (Vernon Supp. 2005). Therefore, it is reasonable to conclude that, had the Legislature
intended the Good Samaritan provision to apply to only those volunteers, it would have used the
specific term "emergency medical services volunteer" rather than the more general term "emergency
medical services personnel."
            (b)       General Statutory Structure and Treatment Supports Excluding Emergency Medical
Services from the Healing Arts

            A general survey of Title 3 of the Texas Occupations Code makes it clear that the term
"healing arts" is treated as nearly synonymous with "health professions" or "the practice of
medicine." Those professions considered to be among the healing arts are addressed at length in
Title 3 of the Texas Occupations Code. Title 3 specifically addresses a number of "other health
professions." Notably, EMS personnel are not addressed among these very specific provisions. See
Lenhard v. Butler, 745 S.W.2d 101, 105 (Tex. App.—Fort Worth 1988, writ denied) (applying rule
of statutory construction that "the express mention of one person, thing, consequence or class is
tantamount to the express exclusion of all others").
            By contrast, the definition, licensure requirements, and other legislative mandates for those
working in the emergency medical services field are treated, not in Title 3 of the Texas Occupations
Code, but in Chapter 773 of the Texas Health and Safety Code, which is devoted specifically to
emergency medical services. Here, we apply the Moore approach, but in a more global manner. 
That is, not only does Section 104.003 of the Texas Occupations Code fail to mention EMS
personnel, as Moore points out, but the entire code, very thorough as to several health professions,
fails to address EMS personnel. See Tex. Occ. Code Ann. § 104.003 (Vernon 2004). This omission
suggests the Legislature considers EMS personnel different from those that practice medicine and,
thus, would exclude them from "the healing arts."
            (c)       Other Statutes Reveal a Legislative Distinction Between Emergency Medical
Personnel and Those Licensed in the Healing Arts

            This suggestion is confirmed by the several distinctions found in a variety of sections of the
Texas Occupations Code and the Texas Health and Safety Code. For instance, Section 773.041 of
the Texas Health and Safety Code requires EMS personnel to be properly licensed or certified. Tex.
Health & Safety Code Ann. § 773.041. But these licensure and monitoring requirements vary
significantly from those imposed by the Texas Occupations Code on other healthcare professionals. 
Compare Tex. Health & Safety Code Ann. §§ 773.041–.050 (Vernon 2003 & Supp. 2005), with
Tex. Occ. Code Ann. §§ 155.001–.058, 164.010, 164.051–.061 (Vernon 2004 & Supp. 2005).
            Additionally, and perhaps more notably, Chapter 773 of the Texas Health and Safety Code,
dedicated exclusively to emergency medical services, specifically excludes physicians and nurses
from coverage under the chapter, absent certain circumstances:
(a) This chapter does not apply to:
 
                        . . . .
 
(5) a physician, registered nurse, or other health care practitioner licensed by
this state unless the health care practitioner staffs an emergency medical services
vehicle regularly.

Tex. Health & Safety Code Ann. § 773.004(a)(5) (Vernon Supp. 2005).
            Further, EMS personnel must work under the supervision of a physician:
(a) The provision of advanced life support must be under medical supervision
and a licensed physician's control.
 
(b) The provision of basic life support may be under medical supervision and
a licensed physician's control.

Tex. Health & Safety Code Ann. § 773.007 (Vernon 2003). Advanced life support is described
as "emergency prehospital care that uses invasive medical acts." See Tex. Health & Safety Code
Ann. § 773.003(1) (Vernon Supp. 2005). Section 773.043 further explains that advanced life
support includes medical acts such as endotracheal intubation. See Tex. Health & Safety Code
Ann. § 773.043.


 Since it is clear that such procedures were properly available here, we proceed
with the understanding that medical supervision was mandatory with respect to the care administered
to Smith. This conclusion is consistent with the structure and duties of EMS personnel as described
by Young. 
            This "medical supervision" refers specifically to "direction given to [EMS] personnel by a
licensed physician under Subtitle B, Title 3, Occupations Code, and the rules adopted under that
subtitle by the Texas State Board of Medical Examiners." Tex. Health & Safety Code Ann.
§ 773.003(18) (Vernon Supp. 2005). Specifically, even a licensed paramedic, the most highly
classified EMS person,


 must work under certain protocols. Tex. Health & Safety Code Ann.
§ 773.0495.
            The record refers to such supervision in terms of field protocols. Young explained that EMS
personnel follow guidelines or field protocols in caring for patients and that these protocols are
generated and distributed to the personnel by the "medical control doctor." Young recounted in-service sessions covering changes in protocols, recalled that her medical control doctor supervised
at least one of these sessions, and explained that, as a paramedic, she "work[s] under medical control
license and perform[s] patient care under the guidelines of our medical control." From Young's
deposition, we learn that protocols provide a series of steps to be followed in the treatment of certain
conditions or ailments and that EMS personnel maintain a binder of protocols on which they are
trained and of those protocols revised or updated. Young stated that she was knowledgeable in the
protocols and that she adhered to those protocols in her treatment of patients, and agreed that a
reasonable and prudent EMS provider should do so. While the record does not contain a copy of
protocols relevant to the case at hand, it is clear that such protocols provide specific guidance in the
emergency treatment of patients and that, through such protocols, a licensed physician directs such
care in a manner consistent with Section 773.007 of the Texas Health and Safety Code.
            Since EMS personnel providing the level of services rendered in this case must and did
operate under the supervision of a licensed physician, we find it inconsistent with this statutory
arrangement to ignore distinctions drawn by respective code provisions. The substance and effect
of several provisions of the Texas Occupations Code and the Texas Health and Safety Code support
the conclusion that licensed EMS personnel are not licensed in the healing arts as intended by former
Section 74.002 of the Texas Civil Practice and Remedies Code.
            (d)       Decisions from Sister Courts Further Support Excluding Emergency Medical
Services from the Healing Arts

            Our conclusion is consistent with Moore and other decisions from our sister courts. Before 
Moore, the Houston First Court of Appeals took a similar position on the matter, albeit a less direct
one. In Wheeler v. Yettie Kersting Mem'l Hosp., 866 S.W.2d 32 (Tex. App—Houston [1st Dist.]
1993, no writ), the court assumed, without expressly deciding, that former Section 74.002 applied
to the EMS personnel involved in that case. In Wheeler, unlike the case in Moore, the court
concluded that the evidence was sufficient to raise a fact issue regarding whether those EMS
defendants acted with willful or wanton negligence. Id. at 51. Therefore, the court reversed the trial
court's summary judgment in favor of the EMTs. Id.
            Our conclusion is also consistent with the Waco court's opinion in Shaw in which the court
had to determine whether a criminal defendant could use a defense similar to that found in the Good
Samaritan provision. See Shaw v. State, 181 S.W.3d 450 (Tex. App.—Waco 2005, pet. filed). 
Shaw, a licensed


 physician's assistant, charged with injury to a child, asserted that the injuries
occurred while Shaw was performing CPR on the child and thus asserted the criminal law's
equivalent of former Section 74.002: "It is a defense to prosecution under this section that the act
or omission consisted of . . . emergency medical care administered in good faith and with reasonable
care by a person not licensed in the healing arts." See Tex. Pen. Code Ann. § 22.04(k)(2) (Vernon
Supp. 2005) (emphasis added) (formerly Tex. Pen. Code Ann. § 22.04(k)(1)(B)). Shaw pointed to
Moore to support her argument that she fell within the definition of "a person not licensed in the
healing arts." Shaw, 181 S.W.3d 450. Careful to point out that Moore "is not in conflict with this
decision," the Waco court rejected Shaw's argument, concluding that Shaw was, in fact, licensed in
the healing arts and could not use Section 22.04(k)'s provisions. Id. The court explained that "a
licensed physician assistant . . . is engaged in the practice of medicine under supervision of a
physician and, unlike an emergency medical technician, is a healthcare provider." Id. (citing Tex.
Occ. Code Ann. §§ 152.003(a)(1)(J), 204.204 (Vernon 2004)) (emphasis added).


 The court also
pointed to the distinctions between the job duties of EMS personnel and a physician's assistant to
further distinguish the facts of Moore. Shaw, 181 S.W.3d 450.
            We conclude that Young and Greene were "not licensed in the healing arts" and, thus, fell
within the protection of the Good Samaritan provision.


 The next question is whether the summary
judgment evidence raises a fact question as to whether their care of Smith was willfully or wantonly
negligent.
(2)       The Evidence Conclusively Establishes that Defendants Did Not Violate the Good Samaritan
Provision's Willful-or-Wanton-Negligence Standard

            In support of their motion for summary judgment, defendants submitted affidavits of
Dunlap's experts and of both Young and Greene. Hess' deposition, in particular, leads to the
conclusion that neither Young nor Greene acted with willful and wanton negligence.
            Though there have been few court opinions on this standard as it applies to the Good
Samaritan laws, Wheeler directly addresses the issue in a summary judgment context. In Wheeler,
the Corpus Christi court reversed and remanded a summary judgment granted in favor of the
defendants, concluding there were fact issues concerning whether the defendants had acted with
willful and wanton negligence. Wheeler explains the standard:
"Heedless and reckless disregard," sometimes termed "willful act or omission" or
"willful and wanton disregard," means "that entire want of care which would raise
the belief that the act or omission complained of was the result of a conscious
indifference to the right or welfare of the person or persons to be affected by it." See
Burk Royalty Co. v. Walls, 616 S.W.2d 911, 916–20 (Tex. 1981). It is synonymous
with "gross negligence." Id. at 920.
Wheeler, 866 S.W.2d at 50 n.25. The court pointed to a great deal of evidence in Wheeler that raised
a fact issue regarding whether the EMS personnel acted with willful or wanton negligence in the
stillbirth of an infant occurring during a ninety-mile transport of a mother in advanced labor. Among
that evidence was the following:
The deposition of EMT Koehler who stated that (1) he believed Wheeler would
deliver en route based on the increasing intensity and shorter spacing of her
contractions; (2) he had the authority to refuse to transport her to John Sealy but did
so anyway; (3) he knew how to maintain an airway for the baby but chose not to do
so for fear of causing the mother to tear and bleed to death; (4) the EMTs had a
limited amount of training in breech births; (5) there were other hospitals along their
route to Galveston but they did not consider taking the patient to any of them.
 
The deposition of EMT Davis who stated (1) he was taught how to maintain an
airway for the baby in a breech birth; (2) he was supposed to perform the procedure
if he had a question about whether the baby was getting air; (3) he would consider the
situation with Mrs. Wheeler a time when the maneuver was appropriate; (4) he
realized that failure to perform the maneuver would result in the baby's oxygen
deprivation and death; (5) he and Koehler discussed performing the procedure but he
made no attempt to do so.
 
The deposition of Dr. Rodriguez who stated that (1) the action of EMT Davis in
tearing the amniotic sac open was "completely wrong" and speeded up the delivery;
(2) the proper procedure when the water breaks is to have the patient lie quietly and
avoid rupturing the membranes; (3) in reasonable medical probability, had the EMTs
followed the proper procedure, there would have been time for Life Flight to arrive
and take Mrs. Wheeler to John Sealy; (4) as Mrs. Wheeler's labor became more
intense, the EMTs should have stopped at one of the several other hospitals en route
to have Mrs. Wheeler rechecked.
Id. at 50–51 (footnote omitted). This evidence was held sufficient to raise a fact question as to
whether the EMS personnel in Wheeler acted with willful or wanton negligence. Having determined
that the former Section 74.002 applies to the instant case, we must now measure the emergency care
administered by Young and Greene in this case by the willful and wanton negligence standard.
            (a)       Failure to Stabilize an Airway Before Transport and Failure to Promptly Intubate

            Hess stated that patients in respiratory distress "require[] rapid airway intervention" and
should be administered "supplemental high oxygen." He added that such supplemental oxygen is
administered through a nonrebreather mask. Young did exactly this and did so before transport. 
            Hess also explained that "[a]ssisted respiration should be done for patients in respiratory
failure" and that this is "usually done with a BVM." Young did just this.
            Hess goes on to explain that he thinks the BVM should have been used while Smith was in
respiratory failure (before she went into arrest). He further notes that "definitely" the standard of
care with respect to a patient in respiratory arrest would dictate use of a BVM. Again, this was done
for Smith. At most, Hess stated that Young should have used a BVM a bit sooner than she did.
            Patients can be appropriately ventilated using a BVM. Hess goes on to explain that it can
also adequately oxygenate the patient on a short-term basis "with appropriate usage." As Young
explained, "You can have an open, patent airway which is able to receive oxygen . . . without
intubation." 
            Dunlap specifically alleged that Young and Greene failed to stabilize the airway before
transport. According to Hess, however, this can be accomplished through use of a BVM. This
testimony is hard to reconcile with Dunlap's allegations regarding failure to intubate. However, in
a previous letter, he explained that endotracheal intubation is the "preferred method." Hess conceded 
there is no evidence here that Smith was not properly ventilated through use of the BVM. He did
not state the same with respect to proper oxygenation since it requires adequate circulation.
            (b)       "Prior to Transport": The Role of Emergency Care

            Hess explained that there are competing schools of thought with respect to the role of
emergency care. One school of thought favors treatment and stabilization of the patient before
transport, under the assumption that, most often, it is easier to work outside the cramped quarters of
an ambulance and have the benefit of both attending EMS personnel, rather than just the one who
is not driving. Hess referred to this approach as the "stay and play" approach and seems to be a
proponent of this approach. The so-called "scoop and run" approach, on the other hand, favors rapid
transport to higher care. Any necessary procedures that can be done en route, according to this
school of thought, should be done en route. Young, it seems, tends to practice this approach.
            Many of Hess' criticisms of Young's care seem to center around the debate on these two
approaches. That is, Hess is of the opinion that, had Young and Greene treated Smith sooner,
perhaps before transport, Smith's condition might have improved. Young explained that her
objective was getting the very critical Smith to the hospital for a higher level of care. Hess conceded
that intubation is a process that can be done en route to the hospital and whether to do so can be "a
judgment call[]." The Good Samaritan law seeks to protect such judgment calls.
            Young indicated she knew Smith required intubation two to three minutes after her secondary
assessment in the ambulance. But, since Smith was so ill in so many ways and considering that
Young was continuing CPR and a method of ventilation, which Hess admitted was acceptable,
Young's failure to immediately intubate does not rise to the level of willful or wanton negligence. 
Again, Hess himself admitted there was no evidence that the BVM was not properly ventilating
Smith.
            (c)       Failure to Administer Cardiac Medications
            Greene


 stated that he and Young did not discuss the administration of the cardiac
medications as a viable treatment, as the EMS personnel in Wheeler had done. So, there is no proof
here that Young and Greene failed to do what they knew should have been done. Rather, Young and
Green acted in a hurry and, as Young explains, were trying to get the very critically ill Smith to the
hospital without delay. 
            Young explained that she would have had to stop compressions and ventilation in order to
have administered the cardiac medications. Hess conceded that it would have been below the
standard of care to halt CPR to administer the medications when the patient is as near to the hospital
as was the case here, especially when that patient is suffering from congestive heart failure and
pulmonary edema. Hess also explained that chest compressions and ventilation are "as important"
as the medications. We also note that Young was successful to an extent in restarting Smith's heart,
having regained a "sinus brady rhythm" which, Hess agreed, was a good sign for a person who had
been in asystole. Hess also explained that there may be some question as to whether the
administration of the medications through the endotracheal tube would have been effective since
Smith was suffering from pulmonary edema.
            In sum, Hess takes the position that, if Young and Greene had intubated sooner it, "might
have improved the condition." Hess maintains that nothing that was done on the ambulance run
caused Smith to go into asystole. He also testified that Young and Greene were "definitely not" out
to harm Smith and that he does not contend the two did not care for Smith. Notably, Hess agreed
that, even if they were negligent, Young and Greene were trying to save Smith. 
            The record raises no question as to whether Young and Greene were willfully or wantonly
negligent. We conclude that the appellees here conclusively established the former Section 74.002
as an affirmative defense. 
            Therefore, we affirm the trial court's summary judgment.




                                                                        Josh R. Morriss, III
                                                                        Chief Justice
 
Date Submitted:          December 14, 2005
Date Decided:             March 3, 2006