IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0211-06






REBECCA ANN SHAW, Appellant



v.



THE STATE OF TEXAS
 




ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE TENTH COURT OF APPEALS


JOHNSON COUNTY





 Price, J., delivered the opinion of the Court in which Keller, P.J., and
Meyers, Keasler, hervey and Cochran, JJ., joined. Johnson, J., filed a dissenting
opinion. Holcomb, J., filed a dissenting opinion. Womack, J., dissented.


O P I N I O N 



 The appellant was charged with intentionally, knowingly, or recklessly causing injury
to a child. The jury convicted her of causing the injury recklessly. On appeal she complained
that the trial court erred in failing to instruct the jury on the so-called "Good Samaritan"
defense. The court of appeals held that the trial court did not err in refusing to submit the
instruction. We granted the appellant's petition for discretionary review to address the
appellant's claim that in so holding the court of appeals applied an incorrect legal standard.

 We hold that the court of appeals applied the correct legal standard in determining
whether the evidence "raised" the "Good Samaritan" defense in this case. We also hold that,
in order to obtain an instruction on the "Good Samaritan" defense embodied in Section
22.04(k) of the Penal Code, (1) the appellant must show that the record contains evidence
sufficient to support a rational finding, not that she lacked the requisite mental state necessary
to commit the offense, but that she in fact harbored the requisite mental state, but nevertheless
engaged in the conduct under emergency circumstances, in good faith, and with reasonable
care. Because the record contains insufficient evidence to establish the defense as so
construed, we will affirm the judgment of the court of appeals.

FACTS AND PROCEDURAL POSTURE

At Trial

 In February 2002, a Johnson County grand jury returned an indictment charging the
appellant with one count of injury to a child and one count of manslaughter. (2) The indictment
alleged, in relevant part, that the appellant, by "shaking [Schuyler Bryce Shaw, a child younger
than fifteen years of age,] and causing his head to strike an unknown object," had intentionally
or knowingly caused serious bodily injury to him (count one, paragraph one), had recklessly
caused serious bodily injury to him (count one, paragraph two), and had recklessly caused his
death (count two). (3)

 In July 2003, the State brought the appellant to trial before a jury on her plea of not
guilty. At the guilt stage of trial, the State presented ten witnesses and a few exhibits, and the
appellant presented one witness (herself) and a few exhibits. The State's first witness, Miranda
Shaw Key, testified that (1) she was the appellant's daughter; (2) she had a twin sister named
Melissa Shaw, who had cerebral palsy, scoliosis, and "some mental incapacities"; (3) on August
30, 2001, while she and Melissa resided with the appellant in Johnson County, she (i.e.,
Miranda) gave birth to a boy, whom she named Schuyler Bryce Shaw; and (4) on October 15,
2001, she transferred her parental rights over Schuyler to the appellant and then moved out of
the residence.

 The State's second witness, Robert Johnson, testified that (1) he was a deputy sheriff
of Johnson County; (2) on November 9, 2001, at around 2:00 p.m., he was dispatched to a
residence "in reference to an infant that wasn't breathing"; (3) upon arrival at the residence,
he found the appellant "doing CPR [cardiopulmonary resuscitation] on an infant"; and (4)
shortly thereafter, emergency medical personnel arrived and transported the infant to Cook
Children's Hospital in Fort Worth.

 The State's third witness, Michael Gaudet, testified that (1) he was a detective with the
Johnson County Sheriff's Office; (2) on the evening of November 9, 2001, he was dispatched
to Cook Children's Hospital in connection with this case; (3) upon arrival at the hospital, he
learned from a doctor that Schuyler Shaw had sustained brain injuries; and (4) while at the
hospital, he also spoke with the appellant. Gaudet's testimony continued:

 Q: What did she tell you about Schuyler's medical history?

 

 A: That Schuyler had "SVT" . . . which is supraventricular tachycardia, which is
basically a heart problem with rhythm, and that the child was taking Digoxin
twice a day for that; also that he had a small heart murmur.

 

 * * *


 

 Q: And what did Rebecca Shaw tell you about what had happened that date,
November 9th, 2001?

 

 A: She told me that approximately 8:30 that morning, that Schuyler Shaw had
woken up, that he had a dirty diaper, loose stool, that [on the] prior day that he
had loose stool all day long, diarrhea; that she then gave him his medicine and
then fed him and he only drank two ounces, that he spit up a little bit. And when
he spit up, it was a little phlegmy. That she then was talking with her mother on
the phone and walked around the house with Schuyler, set down in front of the
computer, because he liked to look at the colors on the computer monitor, and
talked to her mother for a while, and then went and laid him down for a nap about
9:30.


 Q: 9:30?

 

 A: A.M.

 

 Q: Okay. Let me ask you this. Did she tell you who all was home during that
time?

 

 A: Just her and Schuyler.

 

 Q: Did she tell you where Melissa was?

 

 A: Melissa was at school.

 

 * * *


 

 Q: What, if anything, else did she tell about what happened that day?

 

 A: That when she laid Schuyler down for a nap, that she laid him down on his
back to start with. She waited until he had gone to sleep, went back into the
room, rolled him over onto his stomach, and then went about completing her
laundry, and that she came back to wake him back up about 2:30.

 

 Q: So from 9:30 a.m. to 2:30 p.m., she told you, Schuyler was taking a nap?

 

 A: Yes, ma'am.

 

 Q: Okay. And at 2:30 p.m., what did she tell you about what happened?

 

 A: That she had gone in to wake Schuyler up. She checked his diaper, that he
peed in it. He wasn't awake at that point. She called to him. He didn't respond. 
She took his arm. He didn't respond. When she picked him up, that his head fell
fully back and she noted that his breathing was labored. At that point, she
became panicked, ran to the diaper bag, obtained a heart monitor, a contact-type
style, ran to the kitchen, attempted to wet the leads, had to move Schuyler from
one arm into the other arm to operate the faucets. She then checked his heart
beat with the heart monitor and obtained a heart beat of approximately 53 beats
per minute, and he still had labored breathing.

 

 Q: 53 beats per minute?

 

 A: Or 53 beats for a 30-second count.

 

 Q: Okay. At that time, she said, he was still breathing?

 

 A: Yes, ma'am.

 

 Q: And then what did she tell you happened?

 

 A: She thought about calling 911 at that point and then figured that 911
emergency services, the ambulance, the volunteer fire department would not be
able to find her. She then called her landlord, talked to the answering machine,
hung up and then called 911. And at that point the dispatcher found out the
situation, transferred her to . . . American Medical Response, and the volunteer
fire department and the sheriff's officers were in route.

 

 Q: So what, if anything, else did she tell you that she -

 

 A: That she had performed CPR at one point. She remembers that the front
door's locked. She goes to the front door, unlocks the front door. That when
they get there, she's doing CPR. They check Schuyler, and they transport him.

 

 Q: Did you have any conversation with Rebecca Shaw that night about how
Schuyler may have gotten these brain injuries that the doctor told you about?

 

 A: Yes, I did.

 

 Q: And what, if anything, did she tell you about that?

 

 A: I asked her if she accidentally dropped Schuyler, put him down too hard, and
she denied it, at which point I asked her, if you didn't cause these injuries, who
might have, at which point she tells me that Melissa Shaw had dropped Schuyler
on his head the day prior about 8:00, 8:30 in the evening, and that Melissa was
in a seated position in the living room while she was in the kitchen baking
cookies, and she heard a thump that sounded like a hollow melon. She then
came in the living room and found Melissa still seated in the floor, with
Schuyler laying next to her, with Melissa going, "I'm sorry, I'm sorry, I'm
sorry."

 

 Q: And what, if anything, did Rebecca tell you what she did then?

 

 A: Rebecca said that she picked up Schuyler and checked him for injuries. He
didn't have any bruising to the skull or to the skin. He didn't have any cuts. He
didn't have any marks that she could observe, that his eyes looked okay, that he
was still fussy at that point, but everything appeared to be okay with him at that
point.

 The State's fourth witness, Juan Alaniz, testified that (1) he was a social worker at Cook
Children's Hospital; (2) on the evening of November 9, 2001, while he was on duty at the
hospital, he spoke with the appellant about Schuyler Shaw's injuries; and (3) the appellant told
him that two days earlier, Schuyler had fallen out of his aunt's arms onto the floor.

 The State's fifth witness, Donna Dyar, testified that (1) for three days in mid-November
2001, she and the appellant shared a cell in the Johnson County Jail; (2) during that time, she
and the appellant discussed what had happened to Schuyler Shaw; (3) the appellant told her that
"she was going to blame [what had happened to Schuyler] on her daughter, because [her
daughter] was in a wheelchair, and that if she blamed what happened to the baby on her, [her
daughter] wouldn't get in trouble"; (4) the appellant said that her explanation for Schuyler's
injuries would be that "she was in the kitchen baking cookies and she heard a loud noise,
sounded like an egg cracking"; (5) the appellant complained to her that Schuyler's crying "made
her lose her job" because "she couldn't sleep"; (6) the appellant confessed that she shook
Schuyler "because [he] kept crying and wouldn't go to sleep"; and (7) the appellant said that
when she shook Schuyler, he stopped breathing.

 The State's sixth witness, Burton Putegnat, testified that (1) he was a pediatric
radiologist at Cook Children's Hospital; (2) on November 9, 2001, he x-rayed Schuyler Shaw's
brain; (3) the resulting radiographs revealed "diffuse swelling" of Schuyler's brain, with both
"subarachnoid and subdural" hemorrhages; (4) such injuries were " typical . . . after a severe
shaking"; and (5) "when children are shaken severely, they can stop breathing."

 The State's seventh witness, Angel Hernandez, testified that (1) he was a pediatric
neurologist at Cook Children's Hospital; (2) on November 9, 2001, he examined Schuyler
Shaw and reviewed the radiographs of his brain; (3) Schuyler was comatose at that time and
unable to breathe on his own; (4) Hernandez's physical examination of Schuyler revealed that
the boy had no visible external injuries; (5) the radiographs of Schuyler's brain revealed no
skull fracture, but they did reveal both subarachnoid and subdural hemorrhages, with the
subarachnoid hemorrhage being the more serious; (6) Schuyler's injuries were consistent with
a severe shaking or a blunt-force trauma but were not consistent with a fall from a height less
than four feet; and (7) symptoms of the subarachnoid hemorrhage must have occurred within
six hours of a severe shaking or blunt-force trauma. 

 The State's eighth witness, Susan Davis, testified that (1) she was a physician, board-certified in pediatric critical care; (2) in November 2001, she was involved with the care and
evaluation of Schuyler Shaw at Cook Children's Hospital; (3) her examination of Schuyler
revealed "massive brain injury"; (4) such an injury was not consistent with a fall from a low
height; and (5) on November 11, 2001, at 7:30 a.m., she and other doctors at the hospital
declared Schuyler to be brain-dead.

 The State's ninth witness, Marc Krouse, testified that (1) he was a pathologist and
medical examiner for Tarrant County; (2) on November 13, 2001, he performed an autopsy on
Schuyler Shaw's body; (3) the autopsy revealed that Schuyler's death was caused by "something
impacting his head or his head forcibly impacting some surface or object," possibly even bed
padding; (4) "shaking might be how [Schuyler] was coming into impact"; and (5) Schuyler's
injuries were probably not caused by a fall from a low height.

 The State's tenth and final witness, Gail Ledbetter, testified that (1) she was a case
worker in the Texas Department of Human Services (TDHS); (2) on November 6, 2001, at the
TDHS office in Cleburne, she interviewed the appellant in connection with the appellant's
application for public assistance; (3) the appellant was accompanied by "her grandson," who
was in a stroller; (4) the appellant was upset because she had had to quit her job in order to care
for her grandson; and (5) the appellant was also upset because "her fiance had left her . . .
because of the child."

 In addition to witnesses, the State's evidence included four exhibits, the most notable
of which was State Exhibit Number Two, which consisted of Schuyler Shaw's medical records
from Cook Children's Hospital. Those records totaled approximately 200 pages. Included in
the records was a two-page "Pediatric Neurology Consultation" report by Dr. Angel Hernandez,
dated November 9, 2001. In that report, Hernandez expressed the view that Schuyler's
"subarachnoid hemorrhagic is probably the result of aggressive, cardio-pulmonary
resuscitation, although [he could] not rule out the possibility of a non-accidental trauma." (4)

 The appellant took the stand in her defense and testified that (1) in the fall of 2001, she
lived with her two daughters, Miranda and Melissa, and Miranda's baby boy, Schuyler; (2) at
that time, she worked as a "medical assistant" in a pediatrician's office; (5) (3) her duties as a
medical assistant included "everything that was required to take care of all the children in [the
pediatrician's] office: immunizations, checking them in, weighing them"; (4) she had had
training in the proper care of children and understood how to handle a child properly; (5) on
October 15, 2001, Miranda moved out of their residence, leaving Schuyler in the appellant's
care; (6) the appellant took a voluntary leave of absence from her job as a medical assistant in
order to care for Schuyler; (7) caring for Schuyler properly (i.e., feeding him, bathing him,
playing with him, changing his diaper, providing appropriate medical care, etc.) was not a
burden, and she did so happily; and (8) Schuyler had a "heart condition," for which he was given
daily medication. The appellant's testimony continued:

 Q: And [on November 9, 2001,] you woke up, you saw Melissa take the bus to school. 
And at what point did you wake up Schuyler [that] morning?

 

 A: Approximately 8:30.

 

 Q: When you woke Schuyler up, Schuyler woke up, did you notice anything that
would cause you concern about Schuyler?

 

 A: No, sir.

 

 Q: I'm asking you again. Did you notice any visible injury to Schuyler?

 

 A: No, sir.

 

 Q: How was Schuyler's breathing?

 

 A: It appeared to be normal.

 

 * * *


 

 Q: Tell me, on November 9th, 2001, what prompted you to place a phone call
to 911? 


 A: I had found Schuyler in his crib, and he was having labored breathing. And I
felt I needed medical attention, and I couldn't get him to a hospital and watch
him at the same time and drive myself.

 

 Q: Okay. What did you do physically when you saw Schuyler in his crib having
breathing problems?

 

 A: I dropped the clothing that I had in my hand, and I ran to his crib, and I picked
him up, and I called to him. He did not respond.

 

 * * *


 

 Q: Ma'am, I want you to show the jury, when you came in and saw Schuyler in
his crib not responding, show the jury how you picked him up, and what did you
do next?

 

 A: (demonstrating) (6) He was laying like that when I found him.

 

 Q: Okay. That's where he's there. Show me how he was laying.

 

 A: (demonstrating) He was on his stomach, and his head was in this position in
the bed. 

 

 Q: This is about 2:15 p.m. in the afternoon; is that correct?

 

 A: Approximately.

 

 Q: And what did you do next?

 

 A: (demonstrating and crying) I went over, and I went like this, and then I picked
him up like this, and I called his name, and his little head went over. And I pulled
him to me, and I ran through the house to get his heart monitor out of the diaper
bag, which was in the living room . . . .


 Q: At this point, Ms. Shaw, how are you holding the baby as you go to the
monitor? Show the jury -

 

 A: (demonstrating and crying) Like this.

 

 Q: - how you're holding the baby.

 

 A: (demonstrating and crying) I'm holding him like this, and I'm crying, and I'm
telling him to stay with me, hang on.

 

 Q: You then hooked him up to the heart monitor?

 

 A: (demonstrating and crying) No. I went into the kitchen and got a wet rag out
of the drawer. I pulled a rag, and I wet it, and I patted him like this. And I
couldn't get the faucet to turn on, so I switched arms like this. And I got the
faucet on, and I got the rag wet and turned the faucet off and then grabbed the
monitor. I went into the room, the bedroom, because there is no - phone in the
bedroom has a speaker phone, and it's got the attachment for the heart monitor,
because the phone in the living room didn't have that attachment.

 

 Q: Okay. What happened next?

 

 A: (demonstrating and crying) I placed him on the bed with the heart monitor,
and I grabbed the phone, and I placed the receiver button.

 

 Q: Okay. Rebecca, stop now. Show the jury how you placed him on the bed at
this point.

 

 A: (demonstrating and crying) I placed him on the bed like this, and I put the
heart monitor here, and I grabbed the phone and sat it here, and I hit the speaker
button. And the rag was here. It was in my hand, and I threw it there.

 

 Q: Okay. What happened next?

 

 A: (demonstrating and crying) I had dialed my landlord's number, and I got the
recording, and so I hung up the speaker phone, and I hit it again and called 911. 
And the only reason why I called them first was because they were closer, and
I was concerned that 911 wouldn't get to me because I was in the country.

 

 * * *


 

 Q: Okay. You were instructed to perform CPR by the dispatcher, is that
correct?

 

 * * *


 

 A: (demonstrating and crying) I was talking to [the dispatcher], and then he told
me what to do. And he told me to do the rescue breathing and to tip his head
back. So I tipped his head back, and I was blowing in his mouth. And I could feel
I wasn't getting a seal on his nose with my cheek, and I couldn't open my mouth
big enough to get around his mouth and nose.

 

 Q: Are you holding him or is he laying down in a stationary position?

 

 A: (crying) He's on the bed at this time.

 

 Q: Okay. You started performing CPR at this time?

 

 A: Just rescue breathing at first.

 

 Q: Okay. What happened next?

 

 A: (demonstrating and crying) I remember the door was locked, because he said
the paramedics were on their way. And I remembered the door was locked. And
I told him I needed to unlock the door, and so I grabbed Schuyler underneath like
this, because that's how they taught us in ER [Emergency Room?] class to carry
like this. And I went through the house, and I unlocked the door. I was running
through the house, and I unlocked the door.

 

 Q: You unlocked the door, and what happened next?

 

 A: (demonstrating and crying) I ran back to the phone in the bedroom.

 

 Q: And what happened next?

 

 A: (demonstrating and crying) And started doing CPR when the paramedics told
me to do CPR. [Schuyler] was back on the bed, and I was screaming for the
paramedics to hurry.

 

 * * *


 

 Q: Okay. And then at some point did 911 - did somebody from the sheriff's
department arrive, or have we left anything out?

 

 A: The police officer got there first, and he took me by my arm and [said],
"Ma'am, come in here, come in here with me."


 Q: Stop there. Where is Schuyler when this happens? Is he in your arms?

 

 * * *


 

 A: I'm on my knees on the floor, and [Schuyler is] on the bed in front of me.

 

 * * *


 

 Q: What's going on?

 

 A: I don't know what's going on, except the paramedics did come in right after
that, and they started working on [Schuyler].

 

 * * *


 

 Q: [On] November 9th, when the 911 call came down . . . , where was Melissa?

 

 A: She was at school.

 

 Q: Okay. And when did she leave for school that morning?

 

 A: About 7:15 or 7:30 [a.m.], the bus picked her up.


 In summary, the thrust of the State's evidence was that: (1) on November 9, 2001, ten-week-old Schuyler Shaw sustained massive brain injuries, which ultimately caused his death;
(2) those brain injuries were the result of deliberate, severe shaking and/or blunt-force trauma;
(3) the most serious brain injury, the subarachnoid hemorrhage, occurred within six hours of
the severe shaking and/or blunt-force trauma; (4) given the circumstances, only the appellant
was in a position to have caused the injuries; (5) the appellant shook and/or struck Schuyler out
of anger or frustration, because he kept crying and would not go to sleep; and (6) the appellant
concocted a story, involving her daughter Melissa, with which to explain the baby's injuries. 
In contrast, the thrust of the appellant's evidence was simply that: (1) on November 9, 2001,
at around 2:15 p.m., she found Schuyler, who had an abnormal heart, in a non-responsive state;
and (2) she immediately telephoned 911 and, shortly thereafter, began cardiopulmonary
resuscitation.

 At the charge conference, the appellant asked the trial court to instruct the jury on the
Good Samaritan defense provided by Texas Penal Code § 22.04(k)(1)(B) (later recodified,
with its text unchanged, as Texas Penal Code § 22.04(k)(2)). The appellant did not explain to
the trial court how the evidence at trial supported the requested special charge; she simply
urged the trial court to "recall the testimony." The State argued in response that there was no
evidence to support the requested special charge. The trial court denied the appellant's
request. (7) 

 The jury subsequently found the appellant not guilty of intentionally or knowingly
causing serious bodily injury to Schuyler Shaw but found her guilty of recklessly causing
serious bodily injury to him. (8) The jury assessed the appellant's punishment at imprisonment
for twenty years and a fine of $10,000.

On Appeal

 On direct appeal, the appellant brought a single point of error, arguing that the trial court
erred in denying her requested special charge on the Good Samaritan defense. In particular,
the appellant argued that the "Pediatric Neurology Consultation" report by Dr. Angel
Hernandez, introduced into evidence by the State, "raised the defensive issue that the
appellant's attempt to save her grandson's life may have, in fact, tragically [ended] it." 

 The State's response to the appellant's argument was threefold. The State argued first
that "the trial court did not err in denying [the requested] jury instruction because there was no
evidence in the record to raise same." The State argued second that, in any event, the trial court
could not be faulted for denying the requested instruction because "defense counsel failed his
duty of informing the trial court where [in the record] the evidence was that supported [the]
requested jury instruction." (9) The State argued third that, "given the overwhelming evidence that
Schuyler Shaw's injuries were not the result of aggressive CPR, it is inconceivable that the
appellant suffered any harm from the trial court's denial of the requested jury instruction." 

 The court of appeals, by a vote of two to one, overruled the appellant's point of error
and affirmed the judgment of the trial court. (10) The court of appeals explained that, "[b]ecause
a rational juror could not have found that Shaw's conduct in shaking the baby and hitting its
head against an object was reasonable emergency medical care or that Shaw was not licensed
in the healing arts, the defense in question was not raised." (11) The court of appeals did not reach
the State's other two arguments.

 The appellant later filed a petition for discretionary review, which we granted. In her
petition and accompanying brief, the appellant argues: (1) the court of appeals, in determining
whether the trial court erred in denying her requested special charge on the Good Samaritan
defense, "erroneously applied a 'rational-juror test' . . . instead of the well-established
'raised-by-the-evidence test'" (ground for review number one); (2) the court of appeals erred
in holding that the evidence adduced at trial did not raise the Good Samaritan defense (ground
for review number two); and (3) "Are Good Samaritans (other than licensed physicians or
persons acting under the direction of a physician) who are licensed in the healing arts not
entitled to the defense provided by Section 22.04(k)(1)(B) of the Texas Penal Code for their
good-faith conduct in an emergency?" (ground for review number three). We granted the
appellant's petition in order to decide whether the divided court of appeals correctly construed
the statutory defense. (12) Given our disposition of the appellant's first two grounds for review,
we dismiss her third ground as moot.



ANALYSIS

Did the Court of Appeals Apply the Proper Standard?

 We turn first to the appellant's ground for review number one, in which she argues that
the court of appeals used the wrong legal standard in determining whether the trial court erred
in denying her requested special charge on the Good Samaritan defense. The appellant argues
that the correct standard is the "well-established 'raised-by-the-evidence' test," but she fails
to explain how that supposed standard differs from the standard used by the court of appeals. 
Certainly, the phrase "raised by the evidence," as used by the appellant, has no intrinsic
meaning; it must be defined in some way.

 In Texas Penal Code § 2.03(c), the Legislature mandated that "[t]he issue of the
existence of a defense is not submitted to the jury unless evidence is admitted supporting the
defense." (13) Thus, the question of what legal standard must be used by a court in determining
whether, upon request, a defensive issue must be submitted to the jury, is really a question of
statutory interpretation: What did the Legislature mean, in § 2.03(c), by the phrase "evidence
. . . supporting the defense"?

 The answer to that question may be found in our precedents. We have noted before that,
for the purposes of § 2.03(c), a defense is supported (or "raised") if there is evidence in the
record making a prima facie case for the defense. (14) A prima facie case is that "minimum
quantum of evidence necessary to support a rational inference that [an] allegation of fact is
true." (15) We have also stated that, under § 2.03(c), a defendant "bears the burden of production"
with respect to a defense. (16) But, of course, a "burden of production" is nothing more than a
burden of making a prima facie case. (17)

 In short, under § 2.03(c), a defense is supported (or raised) by the evidence if there is 
some evidence, from any source, on each element of the defense that, if believed by the jury,
would support a rational inference that that element is true. (18) In determining whether a
defense is thus supported, a court must rely on its own judgment, formed in the light of its own
common sense and experience, as to the limits of rational inference from the facts proven. (19) 
If a defense is supported by the evidence, then the defendant is entitled to an instruction on that
defense, even if the evidence supporting the defense is weak or contradicted, and even if the
trial court is of the opinion that the evidence is not credible. (20) But the evidence must be such
that it will support a rational jury finding as to each element of the defense.

 The requirement that the evidence must rationally support a jury finding before a
defensive instruction is required serves to preserve the integrity of the jury as the factfinder
by ensuring that it is instructed as to a defense only when, given the evidence, that defense is
a rational alternative to the defendant's criminal liability. (21) If a jury were instructed as to a
defense even though the evidence did not rationally support it, then the instruction would
constitute an invitation to the jury to return a verdict based on speculation. (22) Whether a
defense is supported by the evidence is a sufficiency question reviewable on appeal as a
question of law. (23)

 As far back as 1937, we held that "[c]ourts are only required to submit [defensive]
theories of cases when same are supported by some testimony of sufficient cogence and
substance to make it appear, at least with some degree of likelihood, that there could be a
finding by the jury in response to such suggested issue." (24) That is still the rule today. The
court of appeals utilized the correct legal standard. We overrule the appellant's ground for
review number one.

Did the Evidence Raise the Good Samaritan Defense?

 We turn next to the appellant's ground for review number two, in which she argues that
the court of appeals erred in holding that the evidence adduced at trial did not raise the Good
Samaritan defense. Texas Penal Code § 22.04 provides, in relevant part, that "[a] person
commits an offense if he . . . recklessly . . . by act . . . causes to a child . . . serious bodily
injury." (25) The statute goes on to provide that "[i]t is a defense to prosecution under this section
that the act . . . consisted of . . . emergency medical care administered in good faith and with
reasonable care by a person not licensed in the healing arts." (26) This latter portion of the statute
we refer to as the Good Samaritan defense. 

 The Good Samaritan defense is, on its face, a confession-and-avoidance or
"justification" type of defense. (27) Section 22.04(k)(1)(B) operates as a kind of particularized
example of the justification of necessity, applicable specifically in prosecutions for injury to
a child. (28) Section 9.22 of the Penal Code begins: "Conduct is justified if . . . ." "Conduct," in
turn, is defined in Section 1.07(a)(10) of the Penal Code to mean "an act or omission and its
accompanying mental state." (29) It is a defense to criminal responsibility, under Section 9.02
of the Penal Code, if the criminal "conduct" is "justified." This justification, by definition,
does not negate any element of the offense, including culpable intent; it only excuses what
would otherwise constitute criminal conduct. From this it follows that evidence in a
prosecution for injury to a child that does no more than negate the inference that the defendant
caused the injury intentionally, knowingly, recklessly, or in some instances, with criminal
negligence, does not raise the defense. The appellant is not entitled to a defensive instruction
with respect to evidence that does nothing more than negate an element of the offense. (30)

 We have said with respect to defenses such as necessity and self defense that when the
defensive evidence merely negates the necessary culpable mental state, it will not suffice to
entitle the defendant to a defensive instruction. Rather, a defensive instruction is only
appropriate when the defendant's defensive evidence essentially admits to every element of
the offense including the culpable mental state, but interposes the justification to excuse the
otherwise criminal conduct. For example, in Young v. State, we observed that "[i]n order to
raise necessity, a defendant admits violating the statute under which he is charged and then
offers necessity as a justification which weighs against imposing a criminal punishment for the
act or acts which violated the statute." (31) We held that Young himself was not entitled to a
necessity instruction because he merely "argued he did not commit the offense because he did
not have the requisite intent and he did not perform the actions the State alleged." (32) Similarly,
in Ex parte Nailor, we held that the defendant was not entitled to a jury instruction on self
defense because his defensive evidence did not show confession and avoidance, but only a lack
of the required culpable act and mens rea. (33)

 In the instant case, the appellant asserts that the act by which she administered
emergency medical care, with the requisite good faith and reasonable care, was the CPR she
conducted in order to try to get the child breathing again. She would be entitled to the Good
Samaritan defense under Section 22.04(k) only if the jury could have found that it was this
particular act that actually caused the child's head injury. (34) Dr. Hernandez's preliminary
medical report (albeit not his testimony) concluded that the head injury "is probably the result
of aggressive, cardio-pulmonary resuscitation[.]" Hence, there is some evidence from which
the jury could reasonably have found (but was certainly not required to find) that it was the
appellant's attempted CPR that caused the head injury. The next question is what the evidence
shows the appellant's mental state was, if any, specifically with respect to causing the head
injury (if she did) in that particular way. If there is no indication she harbored any culpable
mental state at all with respect to causing the child's head injury while administering the CPR,
she would not be entitled to the defensive instruction. (35)

 The appellant points to no particular evidence in the record from which it could
rationally be inferred that she harbored some culpable mental state with respect to causing a
head injury in the course of administering CPR. There is only Dr. Hernandez's initial
conclusion in his written report that it could have been the CPR that actually caused the head
injury. This purports to establish nothing, however, with respect to whether the appellant
administered the CPR with any particular mental state specifically with respect to causing a
head injury. As in Young and Nailer, the appellant's defensive posture throughout trial seemed
to be that she performed the CPR without any conscious awareness whatsoever that she might
thereby be causing the child some head injury. This defensive posture serves only to negate
the culpable mental element of the offense. Under these circumstances, a charge to the jury
requiring it to find every constituent element of the offense to a level of confidence beyond
a reasonable doubt before convicting the appellant was all that was required.

CONCLUSION

 For these reasons we hold that the trial court did not err in refusing to submit the
defensive instruction to the jury. Therefore, albeit for reasons somewhat different than those
expressed by the court of appeals in its opinion below, we affirm its judgment affirming the
judgment of the trial court. (36)


Delivered: October 31, 2007

Publish
1. See former Tex. Penal Code § 22.04(k)(1)(B), since recodified without substantive change as
§ 22.04(k)(2). This provision reads: "It is a defense to prosecution under this section that the act or
omission [causing injury or serious bodily injury to a child] consisted of . . . emergency medical care
administered in good faith and with reasonable care by a person not licensed in the healing arts." 
2. See Tex. Penal Code §§ 19.04(a) & 22.04(a)(1).
3. The State abandoned the manslaughter count at some point in the trial before the case was
submitted to the jury.
4. No one at trial discussed, or even mentioned, this report until defense counsel did so during his
closing argument at the guilt stage.
5. On direct examination, defense counsel asked the appellant, "What's the licensing for becoming
a medical assistant to a pediatrician?" The appellant responded, somewhat ambiguously, "You have to go
through school and become licensed. I went through school and graduated."
6. Although it is not entirely clear, the appellant was apparently demonstrating with a doll.
7. At the close of final argument, the appellant again requested a special charge on the Good
Samaritan defense, but that second request was untimely and preserved nothing for appellate review. 
Seefurth v. State, 422 S.W.2d 931, 935 (Tex. Crim. App. 1967); Tex. Code Crim. Proc. art. 36.15;
George E. Dix & Robert O. Dawson, 43A Texas Practice: Criminal Practice and Procedure §
42.217 (2nd ed. 2001).
8. The trial court properly instructed the jury, in accordance with Texas Penal Code § 6.03(c), that:


 "A person acts recklessly, or is reckless, with respect to the result of his conduct when he
is aware of but consciously disregards a substantial and unjustifiable risk that the result will
occur. The risk must be of such a nature and degree that its disregard constitutes a gross
deviation from the standard of care that an ordinary person would exercise under all the
circumstances as viewed from the actor's standpoint."
9. "A trial judge," the State argued, "cannot be expected to remember every bit of testimony adduced
at trial or know the contents of every page of every exhibit offered and admitted."
10. Shaw v. State, 181 S.W.3d 450 (Tex.App.--Waco 2005).
11. Id. at 457.
12. See Tex. R. App. P. 66.3(d) & (e). 
13. Texas Penal Code §2.03(c).
14. Richardson v. State, 622 S.W.2d 852, 856 (Tex. Crim. App. 1981) (op. on reh'g); Garcia v.
State, 528 S.W.2d 604, 605 (Tex. Crim. App. 1975).
15. Tompkins v. State, 774 S.W.2d 195, 201 (Tex. Crim. App. 1987), aff'd, 490 U.S. 754 (1989).
16. Zuliani v. State, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); Saxton v. State, 804 S.W.2d
910, 914 (Tex. Crim. App. 1991).
17. K. Broun (ed.), McCormick on Evidence § 338 at 479 (6th ed. 2006); 31A C.J.S. Evidence
§ 120 (1996).
18. See Wilson v. State, 777 S.W.2d 823, 825 (Tex. App.-- Austin 1989), aff'd, 853 S.W.2d 547
(Tex. Crim. App. 1993); 23A C.J.S. Criminal Law § 1787 (2006). The "rational-juror" standard
enunciated by the court of appeals is the same standard stated in different language.
19. See K. Broun (ed.), McCormick on Evidence § 338 (6th ed. 2006). 
20. E.g., Arnold v. State, 742 S.W.2d 10, 13 (Tex. Crim. App. 1987).
21. Cf. Arevalo v. State, 943 S.W.2d 887, 889 (Tex. Crim. App. 1997) ("[T]he jury is instructed
as to a lesser included offense only when [given the evidence adduced at trial] that offense constitutes a
valid, rational alternative to the charged offense.").
22. See P. Robinson, Criminal Law Defenses § 3(b) (1984).
23. Wilson v. State, 777 S.W.2d at 825; S. Childress & M. Davis, 2 Federal Standards of Review
§ 11.29 (10th ed. 1999).
24. Nickens v. State, 131 Tex. Crim. 510, 514, 100 S.W.2d 363, 365 (1937).
25. Tex. Penal Code § 22.04(a)(1).
26. Id. § 22.04(k)(1)(B), since recodified without substantive change as § 22.04(k)(2).
27. "[A] justification defense is one that defines conduct otherwise criminal, which under the
circumstances is socially acceptable and which deserves neither criminal liability nor even censure." W.
LaFave, Substantive Criminal Law § 9.1(a)(3) at 7 (2nd ed. 2003) (internal quotes omitted).
28. See Tex. Penal Code §§ 9.02 & 9.22.
29. Tex. Penal Code § 1.07(a)(10) (emphasis added).
30. E.g., Ortiz v. State, 93 S.W.3d 79, 92 (Tex. Crim. App. 2002); Solomon v. State, 49 S.W.3d
356, 368 (Tex. Crim. App. 2001); Giesberg v. State, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998). 
See George E. Dix & Robert O. Dawson, 43 Texas Practice: Criminal Practice and Procedure
§ 36.43 (2d ed. 2001).
31. 991 S.W.2d 835, 838 (Tex. Crim. App. 1999).
32. Id. at 839.
33. 149 S.W.3d 125, 132-34 (Tex. Crim. App. 2004).
34. If the jury believed, under the circumstances, that it was by some other act that the appellant
injured the child, then obviously it would have no occasion to consider whether the defense applied, since
it would have rejected the inference that the injury resulted from "emergency medical care."
35. That is to say, if there is no rational basis in the evidence for the jury to conclude that she
administered the CPR with the conscious objective to, or was reasonably certain that she would, or was
at least consciously indifferent whether she would, cause the head injury, then she would not be entitled
to the jury instruction. See Tex. Penal Code § 6.03(a) ("A person acts intentionally, or with intent, with
respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result.");
§ 6.03(b) ("A person acts knowingly, or with knowledge, with respect to a result of his conduct when he
is aware that his conduct is reasonably certain to cause the result."); § 6.03 (c) ("A person acts recklessly,
or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards
a substantial and unjustifiable risk that . . . the result will occur."). We have said on any number of
occasions that injury to a child is a result-of-conduct type of offense. E.g., Jefferson v. State, 189
S.W.3d 305, 312 (Tex. Crim. App. 2006). The appellant was not charged in the indictment with causing
injury to the child by criminal negligence, nor did she seek to have the jury authorized to convict her for that
lesser included offense. 
36. Given this disposition, we need not reach the appellant's third ground for review.