In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No.
06-12-00011-CV

                                                ______________________________

 

 

 

                                                  IN
RE:  KEITH RUSSELL JUDD

 

 

                                                                                                  


 

                                                                                                                            


                                                     Original
Mandamus Proceeding

 

                                                                                                  


 

 

 

 

                                          Before
Morriss, C.J., Carter and Moseley, JJ.

                                              Memorandum
Opinion by Justice Carter

                                                                              

                                                                              








                                                      MEMORANDUM OPINION

 

            Keith Russell Judd
has petitioned this Court for mandamus relief. 
Judd would have us compel the trial court to issue a default judgment on
Judd’s petition for divorce.  We deny
Judd’s requested relief.

            Mandamus issues
only when the mandamus record establishes (1) a clear abuse of discretion or
the violation of a duty imposed by law, and (2) the absence of a clear and
adequate remedy at law.  Walker v. Packer, 827 S.W.2d 833, 839–40
(Tex. 1992) (orig. proceeding); see In re Columbia Med. Ctr. of Las Colinas
Subsidiary, L.P., 290 S.W.3d 204, 207 (Tex. 2009) (orig. proceeding).  It is the relator’s
burden to provide this Court with a sufficient record to establish the right to
mandamus relief.  Walker, 827 S.W.2d at 837; In
re Pilgrim’s Pride Corp., 187 S.W.3d 197, 198–99 (Tex. App.—Texarkana 2006,
orig. proceeding); see Tex. R. App. P. 52.3.

            Judd has provided
this Court with no documents supporting his request.  While he has attached a noncertified copy of
the officer’s return indicating service of process was delivered to the
respondent, he has neither provided a certified copy of the motion for default
judgment Judd claims to have filed in the trial court, nor of any other filings
in the trial court.[1]  

            We find Judd has
failed to demonstrate he is entitled to the extraordinary remedy of mandamus
relief.  We, therefore, deny his
petition.

 

 

 

                                                                        Jack
Carter 

                                                                        Justice

 

Date Submitted:          January
23, 2012

Date Decided:             January
24, 2012

 











[1]This
Court denied a similar request for mandamus relief requested by Judd last
year.  In re Judd, 06-11-00035-CV, 2011 Tex. App. LEXIS 2501 (Tex. App.—Texarkana
Apr. 5, 2011, orig. proceeding) (mem. op.).








 performing CPR on the child and thus asserted the criminal law's
equivalent of former Section 74.002: "It is a defense to prosecution under this section that the act
or omission consisted of . . . emergency medical care administered in good faith and with reasonable
care by a person not licensed in the healing arts." See Tex. Pen. Code Ann. § 22.04(k)(2) (Vernon
Supp. 2005) (emphasis added) (formerly Tex. Pen. Code Ann. § 22.04(k)(1)(B)). Shaw pointed to
Moore to support her argument that she fell within the definition of "a person not licensed in the
healing arts." Shaw, 181 S.W.3d 450. Careful to point out that Moore "is not in conflict with this
decision," the Waco court rejected Shaw's argument, concluding that Shaw was, in fact, licensed in
the healing arts and could not use Section 22.04(k)'s provisions. Id. The court explained that "a
licensed physician assistant . . . is engaged in the practice of medicine under supervision of a
physician and, unlike an emergency medical technician, is a healthcare provider." Id. (citing Tex.
Occ. Code Ann. §§ 152.003(a)(1)(J), 204.204 (Vernon 2004)) (emphasis added).


 The court also
pointed to the distinctions between the job duties of EMS personnel and a physician's assistant to
further distinguish the facts of Moore. Shaw, 181 S.W.3d 450.
            We conclude that Young and Greene were "not licensed in the healing arts" and, thus, fell
within the protection of the Good Samaritan provision.


 The next question is whether the summary
judgment evidence raises a fact question as to whether their care of Smith was willfully or wantonly
negligent.
(2)       The Evidence Conclusively Establishes that Defendants Did Not Violate the Good Samaritan
Provision's Willful-or-Wanton-Negligence Standard

            In support of their motion for summary judgment, defendants submitted affidavits of
Dunlap's experts and of both Young and Greene. Hess' deposition, in particular, leads to the
conclusion that neither Young nor Greene acted with willful and wanton negligence.
            Though there have been few court opinions on this standard as it applies to the Good
Samaritan laws, Wheeler directly addresses the issue in a summary judgment context. In Wheeler,
the Corpus Christi court reversed and remanded a summary judgment granted in favor of the
defendants, concluding there were fact issues concerning whether the defendants had acted with
willful and wanton negligence. Wheeler explains the standard:
"Heedless and reckless disregard," sometimes termed "willful act or omission" or
"willful and wanton disregard," means "that entire want of care which would raise
the belief that the act or omission complained of was the result of a conscious
indifference to the right or welfare of the person or persons to be affected by it." See
Burk Royalty Co. v. Walls, 616 S.W.2d 911, 916–20 (Tex. 1981). It is synonymous
with "gross negligence." Id. at 920.
Wheeler, 866 S.W.2d at 50 n.25. The court pointed to a great deal of evidence in Wheeler that raised
a fact issue regarding whether the EMS personnel acted with willful or wanton negligence in the
stillbirth of an infant occurring during a ninety-mile transport of a mother in advanced labor. Among
that evidence was the following:
The deposition of EMT Koehler who stated that (1) he believed Wheeler would
deliver en route based on the increasing intensity and shorter spacing of her
contractions; (2) he had the authority to refuse to transport her to John Sealy but did
so anyway; (3) he knew how to maintain an airway for the baby but chose not to do
so for fear of causing the mother to tear and bleed to death; (4) the EMTs had a
limited amount of training in breech births; (5) there were other hospitals along their
route to Galveston but they did not consider taking the patient to any of them.
 
The deposition of EMT Davis who stated (1) he was taught how to maintain an
airway for the baby in a breech birth; (2) he was supposed to perform the procedure
if he had a question about whether the baby was getting air; (3) he would consider the
situation with Mrs. Wheeler a time when the maneuver was appropriate; (4) he
realized that failure to perform the maneuver would result in the baby's oxygen
deprivation and death; (5) he and Koehler discussed performing the procedure but he
made no attempt to do so.
 
The deposition of Dr. Rodriguez who stated that (1) the action of EMT Davis in
tearing the amniotic sac open was "completely wrong" and speeded up the delivery;
(2) the proper procedure when the water breaks is to have the patient lie quietly and
avoid rupturing the membranes; (3) in reasonable medical probability, had the EMTs
followed the proper procedure, there would have been time for Life Flight to arrive
and take Mrs. Wheeler to John Sealy; (4) as Mrs. Wheeler's labor became more
intense, the EMTs should have stopped at one of the several other hospitals en route
to have Mrs. Wheeler rechecked.
Id. at 50–51 (footnote omitted). This evidence was held sufficient to raise a fact question as to
whether the EMS personnel in Wheeler acted with willful or wanton negligence. Having determined
that the former Section 74.002 applies to the instant case, we must now measure the emergency care
administered by Young and Greene in this case by the willful and wanton negligence standard.
            (a)       Failure to Stabilize an Airway Before Transport and Failure to Promptly Intubate

            Hess stated that patients in respiratory distress "require[] rapid airway intervention" and
should be administered "supplemental high oxygen." He added that such supplemental oxygen is
administered through a nonrebreather mask. Young did exactly this and did so before transport. 
            Hess also explained that "[a]ssisted respiration should be done for patients in respiratory
failure" and that this is "usually done with a BVM." Young did just this.
            Hess goes on to explain that he thinks the BVM should have been used while Smith was in
respiratory failure (before she went into arrest). He further notes that "definitely" the standard of
care with respect to a patient in respiratory arrest would dictate use of a BVM. Again, this was done
for Smith. At most, Hess stated that Young should have used a BVM a bit sooner than she did.
            Patients can be appropriately ventilated using a BVM. Hess goes on to explain that it can
also adequately oxygenate the patient on a short-term basis "with appropriate usage." As Young
explained, "You can have an open, patent airway which is able to receive oxygen . . . without
intubation." 
            Dunlap specifically alleged that Young and Greene failed to stabilize the airway before
transport. According to Hess, however, this can be accomplished through use of a BVM. This
testimony is hard to reconcile with Dunlap's allegations regarding failure to intubate. However, in
a previous letter, he explained that endotracheal intubation is the "preferred method." Hess conceded 
there is no evidence here that Smith was not properly ventilated through use of the BVM. He did
not state the same with respect to proper oxygenation since it requires adequate circulation.
            (b)       "Prior to Transport": The Role of Emergency Care

            Hess explained that there are competing schools of thought with respect to the role of
emergency care. One school of thought favors treatment and stabilization of the patient before
transport, under the assumption that, most often, it is easier to work outside the cramped quarters of
an ambulance and have the benefit of both attending EMS personnel, rather than just the one who
is not driving. Hess referred to this approach as the "stay and play" approach and seems to be a
proponent of this approach. The so-called "scoop and run" approach, on the other hand, favors rapid
transport to higher care. Any necessary procedures that can be done en route, according to this
school of thought, should be done en route. Young, it seems, tends to practice this approach.
            Many of Hess' criticisms of Young's care seem to center around the debate on these two
approaches. That is, Hess is of the opinion that, had Young and Greene treated Smith sooner,
perhaps before transport, Smith's condition might have improved. Young explained that her
objective was getting the very critical Smith to the hospital for a higher level of care. Hess conceded
that intubation is a process that can be done en route to the hospital and whether to do so can be "a
judgment call[]." The Good Samaritan law seeks to protect such judgment calls.
            Young indicated she knew Smith required intubation two to three minutes after her secondary
assessment in the ambulance. But, since Smith was so ill in so many ways and considering that
Young was continuing CPR and a method of ventilation, which Hess admitted was acceptable,
Young's failure to immediately intubate does not rise to the level of willful or wanton negligence. 
Again, Hess himself admitted there was no evidence that the BVM was not properly ventilating
Smith.
            (c)       Failure to Administer Cardiac Medications
            Greene


 stated that he and Young did not discuss the administration of the cardiac
medications as a viable treatment, as the EMS personnel in Wheeler had done. So, there is no proof
here that Young and Greene failed to do what they knew should have been done. Rather, Young and
Green acted in a hurry and, as Young explains, were trying to get the very critically ill Smith to the
hospital without delay. 
            Young explained that she would have had to stop compressions and ventilation in order to
have administered the cardiac medications. Hess conceded that it would have been below the
standard of care to halt CPR to administer the medications when the patient is as near to the hospital
as was the case here, especially when that patient is suffering from congestive heart failure and
pulmonary edema. Hess also explained that chest compressions and ventilation are "as important"
as the medications. We also note that Young was successful to an extent in restarting Smith's heart,
having regained a "sinus brady rhythm" which, Hess agreed, was a good sign for a person who had
been in asystole. Hess also explained that there may be some question as to whether the
administration of the medications through the endotracheal tube would have been effective since
Smith was suffering from pulmonary edema.
            In sum, Hess takes the position that, if Young and Greene had intubated sooner it, "might
have improved the condition." Hess maintains that nothing that was done on the ambulance run
caused Smith to go into asystole. He also testified that Young and Greene were "definitely not" out
to harm Smith and that he does not contend the two did not care for Smith. Notably, Hess agreed
that, even if they were negligent, Young and Greene were trying to save Smith. 
            The record raises no question as to whether Young and Greene were willfully or wantonly
negligent. We conclude that the appellees here conclusively established the former Section 74.002
as an affirmative defense. 
            Therefore, we affirm the trial court's summary judgment.




                                                                        Josh R. Morriss, III
                                                                        Chief Justice
 
Date Submitted:          December 14, 2005
Date Decided:             March 3, 2006